Filed 8/24/20  In re M.P. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re M.P. et al., Persons Coming Under the Juvenile Court Law. | B303401 <br><br> (Los Angeles County Super. Ct. No. 18LJJP00441A–C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MO. P., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Michael C. Kelley, Judge. Conditionally affirmed and remanded with directions.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, David Michael Miller, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## I.   INTRODUCTION

Mo.P. (father) appeals from the juvenile court's order terminating his parental rights to his three children pursuant to Welfare and Institutions Code section 366.26.[1] Father contends that the court failed adequately to consider the children's wishes before terminating his parental rights. Father also contends that remand is necessary to allow the court to comply with the inquiry and notice requirements of the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.).

We conditionally affirm the order terminating parental rights, but remand for the limited purpose of ensuring compliance with the inquiry and notice requirements of ICWA.

---

[1]   All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

## II. BACKGROUND

A. *Section 300 Petition*

On August 28, 2017, the San Bernardino County Department of Children and Family Services (San Bernardino Department) filed, in the Superior Court of San Bernardino County, petitions on behalf of the three children, under section 300.  The petitions alleged, as sustained by the juvenile court, the following counts:

"B-2.  [Father] engaged in a violent physical altercation in the presence of the children, [M.P., A.P., and Z.P.] which places them at substantial risk of harm and/or neglect.

"B-3.  On or about August 18, 2017[, father] left the children, [M.P., A.P., and Z.P.] without making arrangements for their care in his absence which places the children at substantial risk of harm and/or neglect."

B. *Jurisdiction and Disposition Hearings*

On November 9, 2017, the juvenile court sustained two counts of the section 300 petitions' allegations, declared the children dependents of the court, removed them from their parents, and placed them in foster care.  The court also granted father monitored visitation once a week for two hours.

C. *Six-Month Review Period*

In an April 26, 2018, Status Review Report, a social worker reported that, during the reporting period, father had "been

somewhat reluctant to cooperate" and had "demonstrated minimal progress . . . ." The social worker further advised that father's visits had been increased to four hours once a week and that he was "consistent with his visits and display[ed] proper parenting during his visits." According to the social worker, the children were "very bonded with their father and enjoy[ed] spending time with him." The social worker also observed, however, that father displayed "anger and a lack of understanding as to his children's removal and [his] responsibility [for it]."

D.    *12-Month Review Period*

On July 12, 2018, following father's move to Lancaster, the San Bernardino juvenile court transferred the matters to the Superior Court of Los Angeles County.

In an October 24, 2018, Interim Review Report, a social worker with the Los Angeles County Department of Children and Family Services (Department) reported that on August 13, 2018, father told her that he had not visited with his children in four weeks,[2] but that he wanted to reschedule his visits as soon as possible. On August 27, 2018, father had a two-hour unmonitored visit with the children. On September 17, 2018, during an unmonitored visit, father allowed mother to visit with the children, in violation of the juvenile court's order. Mother told the social worker that she had moved in with father on September 1, 2018. Father initially denied knowing where

_____

[2]    A San Bernardino County social worker advised that father's visits had been "'on hold because he went to the hospital.'"

4

mother lived and then told the social worker that mother's residence was "'not [the social worker's] concern.'" Mother later reported that she moved out of father's residence in early October 2018.

According to the social worker, the foster mother had expressed concerns about unmonitored day visits as she believed father "would be overwhelmed taking care [of all three children] at the same time because [Z.P. was] hyperactive and require[d] a lot of attention."

The social worker also reported that the children had been placed with the foster parents since September 14, 2017, and that they had "adjusted well in their placement and they appear[ed] to be doing well under the care of [the foster parents]."

In an October 24, 2018, Last Minute Information, the social worker opposed liberalizing father's visitation because he was not truthful about mother's contacts with the children and refused to allow his boyfriend to be live scanned. The Department recommended that reunification services be terminated.

On November 8, 2018, the juvenile court conducted the 12-month review hearing. At that hearing, the court set the issue of termination of reunification services for a contested hearing at father's request on February 14, 2019.

In a January 29, 2019, Interim Review Report, the social worker informed the juvenile court that, on an unspecified date between September 17 and December 12, 2018, father had been in a car accident due to a seizure and had been unable to visit the children. Father resumed visiting the children in a monitored setting on December 9, 2018, and thereafter had monitored visits with the children on December 16, 22, 29, 2018, and

5

January 6, 2019.  But he failed to appear for a scheduled visit on January 13, 2019.

The social worker further reported that the children were well adjusted in their foster home and "appear[ed] to feel safe and well under the care of [the foster parents.]"  According to the social worker, the Department believed "it [was] in [the] children's best interest to remain as placed" because "[t]hey [were] happy and the placement remain[ed] stable."

In a March 8, 2019, Last Minute Information, the social worker advised that the Department continued "to experience difficulties and challenges with case management [because father was] not being truthful and making demands."  Among other things, father wanted visits to take place in Little Rock which, according to the foster parents, was not halfway between father's Lancaster residence and their home.  When arrangements were made for a March 2, 2019, visit in Little Rock, father insisted that the foster parents pay for the children's lunch because he was unable to pay.

In an April 10, 2019, Last Minute Information, the social worker reported that father had two-hour visits with the children at a park on March 24, 31, and April 1, 2019.  According to the social worker, father's visits were scheduled to be increased to four hours at his home.  During the reporting period, father admitted to the social worker that taking care of Z.P. at visits was challenging compared to caring for the two older children.

In a May 29, 2019, Interim Review Report, the social worker reported that father had four-hour visits with the children on April 6, 13, and 20, 2019, but cancelled his scheduled visit on April 27, 2019.  On May 4, 2019, father had  a six hour visit with the children.  Father's next visit on May 11, 2019, also

lasted six hours, but he cancelled the next visit scheduled for May 18, 2019. The social worker reported that the children enjoyed their visits with father and that he wanted the visits to be increased to overnight weekend visits. According to the foster parents, the children arrived home after visits "exhausted and hungry," and M.P. appeared "worried after . . . visits with father."

At the June 6, 2019, continued hearing on termination of reunification services, the juvenile court found that father had made only partial progress toward reunification and therefore terminated reunification services. The court set a section 366.26 permanency planning hearing and confirmed that all visitation orders regarding father were to remain in force and effect with discretion in the Department to liberalize.

E.    *Section 366.26 Proceedings*

On August 14, 2019, the Department filed a section 388 petition requesting that father's visitation rights be restricted to one two-hour visit per month. According to the Department, it was "concerned about father's erratic and unpredictable behaviors and [the] safety of the children" because father (1) refused to allow the Department to verify his address; (2) refused to disclose information about his vehicle; and (3) was arrested in June 2019 for an assault after "drinking excessively," although the charge was eventually dismissed.

In a September 12, 2019, Section 366.26 Report, the social worker reported that, following the filing of the Department's section 388 petition, father was offered monitored visits for two hours at a Victorville McDonald's, but father wanted six-hour visits, stating that he wanted to drive the children to Malibu.

7

Father also wanted overnight weekend visits, explaining that "he would sleep with the children at a motel" because he did not want the social worker to verify his current residence. According to the social worker, the Department was "concerned about . . . father driving with the children [because he had] a couple of prior [collisions] due to his seizures." The Department was also concerned that "father might run away to Georgia with the children" based on previous comments he had made. Finally, the Department had concerns about father's mental health because "he engage[d] in arguments and fights with people."

The social worker also informed the juvenile court that the children's placement with the foster parents had been "consistent with . . . their basic needs of life" and the children had "developed a close bonding relationship with [them]." Further, the foster parents loved the children and wished to adopt them. As to the children's wishes, the social worker stated that M.P. had expressed a desire to "stay[] in []his current home with [the foster parents]." And, although the two youngest children were "not capable of making a statement about permanency," they appeared to be "happy and thriving inside [the] home." The Department recommended that father's parental rights be terminated so that the children could be adopted by the foster parents.

On October 4, 2019, the juvenile court considered the Department's section 388 petition and granted it, ordering that father's visits be restricted to monitored two-hour visits once a month.

In a November 4, 2019, Progress Report, the social worker reported that on October 5, 2019, father requested a visit with the children, but when the social worker arranged a visit for

8

October 10, father cancelled the visit the day before. On October 25, 2019, father visited the children at a Victorville McDonald's and bought them lunch. The foster mother monitored the visit, observed that the children enjoyed playing at McDonald's, and had no concerns about the visit. The Department continued to recommend a permanent plan of adoption by the foster parents.

The juvenile court conducted the section 366.26 hearing over three days, beginning on November 21, 2019. The children were represented by counsel, who, at the outset of the hearing, requested that parental rights be terminated, noting that the children had "been with the current caretakers for . . . over two years . . . [and had] been provided with stability, and [deserved] to have permanency." The court admitted the Department's exhibits into evidence.

Father testified at the hearing that all three children wanted to live with him, particularly M.P., who cried during visits in San Bernardino because he wanted to live with father.[3] The children were always excited to visit with father and happy to see him. At the end of visits, the children would go back to their foster home and accept the situation because they knew they needed to be patient.

On cross-examination, father admitted that after the case was transferred to Los Angeles County in August 2018, there was an interruption in visitation due to scheduling issues caused by the transfer. Father also admitted that he did not visit his children for four-and-a-half months, from approximately June through October 2019, and that since October 2019, his visits had

---

[3] We presume father was referring to visits prior to his move to Lancaster, around August 2018.

9

been limited to monitored two-hour visits once a month.  His visits were currently monitored by the foster mother and her daughter.  Father had regular telephone contact with his children through a video phone using a sign language interpreter.  But he admitted that those phone contacts were often cut short.

Following testimony, counsel for the children again requested that parental rights be terminated, citing father's erratic behavior, lack of stability, and missed visits.

At the conclusion of the hearing, the juvenile court made its findings regarding the applicability of the parental benefit exception.  The court stated: "[F]ather's visits with the [children] have not been the kind of regular consistent and high-quality visits that would demonstrate the existence of a strong parenting bond that would meet the test of section 366.26[, subdivision] (c)(1)(B)(1) . . . .  [¶]  . . . Moreover, considering all the evidence, I find that the visits that he did have were more akin to friendly visits than to interactions evidencing the existence of a parenting relationship.  [¶]  I also find that father's failure to visit regularly and create a bond, a parenting bond, with the [children] was not caused by anything that the Department did or failed to do, or is in any way a result of the father's communication challenges . . . .[4]  [¶]  . . .  [¶]  In conclusion, the relationship that father has with the [children] does not provide the kind of substantial positive and emotional attachment that would cause great harm to the [children] if parents' rights were terminated and the children were adopted."  The court therefore terminated father's parental rights and freed the children for adoption.

---

[4]  Father communicated with M.P. through American Sign Language.  Neither A.P. nor Z.P. knew American Sign Language.

# III.    DISCUSSION

## A.    *Termination of Parental Rights*

### 1.    <u>Legal Principles</u>

"At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child." (*In re Noah G.* (2016) 247 Cal.App.4th 1292, 1299.)  At this stage of the proceedings, the preferred plan is adoption.  (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 645.)  "First, the court determines whether there is clear and convincing evidence the child is likely to be adopted within a reasonable time.  [Citations.]  Then, if the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of the enumerated statutory exceptions applies." (*Id.* at pp. 645–646.)

"The parental benefit exception applies when there is a compelling reason that the termination of parental rights would be detrimental to the child.  This exception can only be found when the parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship.  (§ 366.26, subd. (c)(1)(B)(i).)" (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395 (*Anthony B.*); accord, *In re E.T.* (2018) 31 Cal.App.5th 68, 75–76.)  For the benefit prong of the exception, "[t]he issue . . . is not whether there was a bond between [the parent] and [the child].  The question is whether that relationship remained so significant and compelling in [the child's] life that the benefit of preserving it outweighed the

11

stability and benefits of adoption." (*Anthony B., supra*, 239 Cal.App.4th at p. 396.)

Prior to terminating parental rights, "the court shall consider the wishes of the child and act in the best interest of the child." (§ 366.26, subd. (h)(1).) "We interpret this statute as imposing a mandatory duty on the courts to 'consider the child's wishes to the extent ascertainable' prior to entering an order terminating parental rights under section 366.26, subdivision (c). [Citation.]" (*In re Leo M.* (1993) 19 Cal.App.4th 1583, 1591 (*Leo M.*).)

### 2. Analysis

Father contends that the juvenile court erred by failing adequately to consider the children's wishes prior to terminating his parental rights. According to father, the court's ruling did not mention the children's wishes and, based on the minimal information provided by the Department concerning those wishes, the court "could not have adequately discharged its duty to consider the wishes of the children prior to terminating parental rights." We disagree.

As noted above, the record included evidence about the children's wishes. Specifically, the Department reported that M.P. had expressed a desire to "stay[] in []his current home with [the foster parents]." And, although the two youngest children were "not capable of making a statement about permanency," they appeared to be "happy and thriving inside [the] home."

Father, however, challenges the Department's recitation of M.P.'s wishes, citing *In re Diana G.* (1992) 10 Cal.App.4th 1468 (*Diana G.*) for the proposition that section 366.26, subdivision (h)

12

"require[s] the juvenile court to receive direct evidence of the children's wishes regarding termination and adoption at the permanency planning hearing . . . . Although a child's presence in court is not required, an out-of-court statement, as in a report or other form, must reflect the fact that the child is aware that the proceeding involves the termination of parental rights." (*Id.* at p. 1480.) Father notes that the Department's description of M.P.'s wishes, "is missing the relevant operative words," that is, the Department did not expressly state that M.P. was aware that the proceedings involved the termination of parental rights. But, as father concedes, subsequent cases have rejected *Diana G.*'s interpretation of section 366.26. (See *Leo M., supra*, 19 Cal.App.4th at p. 1592 ["We see no requirement in section 366.26, subdivision [(h)] that evidence indicating the child's wishes be direct or that the child be aware that the proceeding is a termination action for purposes of assessing the child's preferences."]; accord *In re Amanda D.* (1997) 55 Cal.App.4th 813, 820 (*Amanda D.*).) We join our sister courts in rejecting father's argument that the record was required to reflect that the children were aware the proceedings involved the termination of parental rights.

Father also seems to challenge the credibility of the social worker's assessment that the two younger children were incapable of stating their wishes regarding the termination of parental rights. Father points out that A.P. was five years old at the time of the section 366.26 hearing, and suggests that, given his age, the social worker was required to obtain a statement about his wishes. He makes a similar argument about three-year old Z.P., stating that "'an attempt should [have been] made to obtain this information [from Z.P.]'" We note, however, that

13

father never argued in the juvenile court that the court was required to obtain additional evidence regarding the children's wishes. (*See Amanda D., supra*, 55 Cal.App.4th at pp. 819–820 [because father "raised no issue below that the juvenile court should have obtained the minors' testimony regarding their wishes for a permanent plan," he was precluded from raising the issue on appeal].) Further, to the extent father questions the credibility of the social worker's statement, "[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Contrary to father's assertion, the record here supports a reasonable inference that the juvenile court adequately considered the children's wishes. The social worker submitted direct evidence about M.P.'s desire to remain with the prospective adoptive family and the inability of the two younger children to make a statement about permanency. Further, the Department's reports reflected that the children were well adjusted to and thriving with the prospective adoptive parents, with whom they had continuously resided for over two years. Substantial evidence supports a conclusion that the court adequately complied with section 366.26, subdivision (h), by considering the children's wishes before terminating parental rights.

14

B.    *ICWA Violation*

Father next contends that the Department did not adequately inquire about his Indian ancestry as required under ICWA. According to father, in January 2019, the children's paternal grandmother informed the Department that she had "Xious" ancestry. Father maintains that, because the spelling of "Xious" was "conspicuously similar to 'Sioux,'" the paternal grandmother's information triggered a duty on the part of the Department to inquire further, which duty, in turn, the court was required to enforce.[5]

In response to the ICWA contention, the Department concedes the issue and does not oppose father's request for a limited remand to ensure that adequate inquiry is made and, if necessary, notice is provided to the tribe. In light of the Department's concession, we agree that remand is warranted to ensure ICWA compliance. We therefore conditionally affirm the judgment and remand the matter with directions to the juvenile court to order the Department to make further inquiry and, if necessary, to provide notice to the tribe.

---

[5]    In response to the information about father's Indian ancestry acquired by the social worker, the Department sent notices to the Secretary of the Interior, the Bureau of Indian Affairs, and three Cherokee tribes, but not to any Sioux tribe.

## IV.  DISPOSITION

The order terminating parental rights is conditionally affirmed and the matter is remanded with directions to the juvenile court to order the Department to make further inquiry concerning father's Sioux ancestry and, if necessary, to provide notice to the tribe.  If, after proper inquiry and notice, an Indian tribe asserts that any of the children is an Indian child, the juvenile court shall proceed in conformity with the provisions of ICWA and the relevant law.  If no Indian tribe asserts that a child is Indian after proper inquiry and notice, the order terminating parental rights is to be reinstated for that child.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

RUBIN, P. J.

BAKER, J.

16