Filed 6/6/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re NOAH G., et al., Persons Coming Under the Juvenile Court Law. | B268442<br>(Los Angeles County<br>Super. Ct. No. DK01921) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>          Plaintiff and Respondent,<br><br>          v.<br><br>A.R.,<br><br>          Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

## I.  INTRODUCTION

The mother, A.R, appeals from the September 29, 2015 order terminating her parental rights.  She argues the juvenile court should have applied the  beneficial parent-child relationship exception pursuant to Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i).  The juvenile court reasonably concluded the mother failed to show her relationship with the children outweighed the benefits of adoption.  We affirm the order.

## II.  PROCEDURAL HISTORY

On October 22, 2013, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition.  The petition was filed on behalf of four-year-old Noah G. and newborn Jose G.  The petition alleges the children are dependents of the juvenile court under section 300, subdivision (b).  The petition alleges: the mother has a history of illicit drug abuse, including marijuana and methamphetamine; this drug use renders her incapable of providing the children with proper care and supervision; the mother used illicit drugs throughout her pregnancy with Jose; the mother tested positive for methamphetamine at Jose's birth on October 16, 2013; and the

---

[1] Future statutory references are to the Welfare and Institutions Code.

mother's drug abuse endangered the children's health and safety and placed them at risk of physical harm and damage.

At the October 22, 2013 detention hearing, the juvenile court found the department made a prima facie showing that the children were described by section 300, subdivision (c). The juvenile court released the children to the mother over the department's objection. The department was ordered to: provide family maintenances services to the mother and father; refer the family to family preservation services; make unannounced home visits; and refer the parents for weekly random and on demand drug testing.

At the March 4, 2014 adjudication and disposition hearing, the juvenile court sustained the amended petition under section 300, subdivision (b). The children were placed in the home of the parents under the supervision of the department. The parents were ordered to participate in individual, drug and alcohol counseling, random alcohol and drug testing, and parenting classes.

On August 4, 2014, the department filed a supplemental petition pursuant to section 387. The section 387 petition alleges the parents tested positive for drugs and failed to regularly participate in a substance abuse treatment program. The parents' failure to comply with the juvenile court's orders endangered the children's health and safety and placed them at risk of physical harm. At the detention hearing on the supplemental petition, the juvenile court detained the children. The juvenile court ordered the department to provide the family with family reunification services. The parents were granted monitored visits at least twice a week with the department having discretion to liberalize visits and to release the boys to a parent.

3

At the September 19, 2014 jurisdiction and disposition hearing, the juvenile court sustained the allegations in the section 387 petition. The juvenile court ordered the children placed with their maternal grandmother. The department was ordered to provide the family with reunification services. The parents were granted monitored visits at least twice a week for at least one hour with the department having discretion to liberalize. The parents were ordered to participate in: individual, alcohol and drug counseling; random alcohol and drug testing; and parenting classes. At the May 4, 2015 six-month review hearing, the juvenile court found the children's return to the parents' custody would create a substantial risk of detriment to the youngsters' well-being. The juvenile court found the parents were not in compliance with the case plan and terminated family reunification services.

At the section 366.26 hearing on September 29, 2015, the juvenile court found by clear and convincing evidence that the children would likely be adopted. The juvenile court found the beneficial parent-child relationship exception did not apply and terminated parental rights. The juvenile court explained: "It is clear that the parents have had regular consistent visitation and contact and do have a parental role and relationship in the children's lives, but they have participated in no programs in over a year. [¶] The younger child has lived with them less than half of his life. The case law and code discussed two different things; one is the extent to which the parental role and relationship outweighs the benefit of permanence to adoption, which I don't think the parents have shown, especially in light of their failure to participate in anything in the last year and the fact that they still have monitored visits. [¶] The limited amount of time

4

that Jose has lived with them and Noah being out of their care for over a year.  Second issue is whether it would be emotionally detrimental to the children to terminate the parental role and relationship, and at this point there's been no showing that it would be emotionally detrimental to the children, especially to Jose.  [¶]  The children enjoy visiting with their parents and having the parents over, would like to be able to live with their parents, if they could, but that is impossible.  Even the extent to which the mother discusses Noah being unhappy when she leaves at the end of the day, really didn't show that being to the level of emotional detriment."

The mother filed her notice of appeal on September 29, 2015.


III.  EVIDENCE

-

A.  October 22, 2013 Detention Report


On October 16, 2013, the department received a referral alleging the mother and Jose tested positive for amphetamines.  The mother did not receive prenatal care during her pregnancy with Jose.  She started using methamphetamine and marijuana 10 years ago, using drugs on the weekends or on a monthly basis.  The mother began using drugs because of the pressure of taking care of the maternal great-grandmother.  She used methamphetamine from January to June 2013 because she did not think she was pregnant.  The mother stopped using methamphetamine in June but admitted she used drugs in August and on October 13, 2013.  The children were released to the father.  The

parents and the children's social worker agreed the father and the children would move in with the maternal grandmother, Pamela R.

### B. Jurisdiction and Disposition Report

The March 4, 2014 jurisdiction and disposition report states the children remained in the care and custody of the parents. The children were bonded with the parents. The parents agreed they would benefit from the substance abuse treatment programs. They also agreed to comply with all court-order services including random drug testing. But the parents failed to appear for drug tests. The parents also had not participated in any drug treatment program but reported they would start soon.

### C. August 4, 2014 Detention Report

On July 30, 2014, the children were detained after the mother tested positive for methamphetamine and amphetamine. The mother tested positive for cannabinoids on March 10, 2104. Of the 14 random drug tests from March 25 to July 14, 2014, the mother missed 12 tests. The mother tested positive for methamphetamine and amphetamine on July 23, 2014, when she came for intake at a substance abuse treatment program. The father failed to appear for any drug tests after he tested positive for cannabinoids on March 11, 2014, while in treatment. The father stopped coming to treatment and was discharged from the drug treatment program on April 4, 2014.

According to the detention report, the mother appeared overwhelmed and did not follow up on family preservation services offered by the department social worker. The parents failed to take Noah for tutoring and for speech therapy evaluation. Mona Raya from the Duarte child center stated: "[I]t has been a real, real struggle to work with them. The child is always late. Mom knows that the child will be going to kinder, but the child is never here in school. He was supposed to be tested for services, but since the child is never here, they already missed 2 appointments. I always call mom and she never picks up." The parents admitted they were not in compliance with the court orders and had no excuse. The parents reported they were "'lacking motivation'" to do anything.

D. Status Review Reports

The August 13, 2014 interim review report indicates the children were placed with the maternal grandmother on August 8, 2014. The maternal grandmother resides in a two bedroom, two bathroom apartment in the same apartment complex as the parents. The maternal grandmother lives with Terri R., a sister. Also residing in the maternal grandmother's apartment are Terri's two adult daughters, Amore R. and Megan R. They converted one of the bedrooms into the children's room with a bed for Noah and a crib and changing table for Jose. The maternal grandmother was retired and could be home to take care of both of the children. The maternal family had a close relationship with the children and saw them every single day. The maternal family stated they would comply

7

with the court orders and limit the parents to visitation hours as if the children were in placement.

The March 19, 2015 status review report states: the children continue to thrive in the maternal grandmother's home; the parents live nearby and were a daily presence in the children's lives; the mother reported seeing the boys almost every day and helping to care for them; both parents had a very close relationship with the children; the maternal grandmother reported the visits went very well; the parents did not participate in any substance abuse treatment program and failed to appear for any drug tests; and the parents missed all 11 drug tests from August 2014 to February 2015. The department was unable to determine if the parents were drug free because they both continued to refuse to test after results came back positive. The maternal grandmother stated she was "'more than willing to adopt'" the children if the parents failed to reunify with the boys.

### E. Section 366.26 Report

The September 29, 2015 section 366.26 report states: the children were bonded with the parents and maternal grandmother; the parents live in the same apartment complex as the children and visited them regularly; all visits were monitored by the maternal grandmother ; and family reunification services for the parents were terminated on May 4, 2015. The parents failed to comply with the court orders. According to the report, the parents failed to drug test and complete a narcotics treatment program. According to the social worker, the parents admitted they lacked the motivation to obey

8

court orders or begin court-ordered programs. The department recommended termination of parental rights with adoption as the permanent plan.

F. Testimony at Section 366.26 Hearing

On September 29, 2015, the section 366.26 hearing was held. Children's social worker Priya Chakrabarti testified the mother saw the children every day according to the maternal grandmother. The mother's visits were monitored by the maternal family. The mother would come over and drop Noah off to school with two of the maternal relatives. Then she would return to the maternal grandmother's apartment and spend time with Jose while Noah was at school. The mother would bathe Jose and prepare and feed him food. Ms. Chakrabarti had seen the mother bring groceries over to the maternal grandmother's home. The mother would pick up Noah from school with Megan R. or Amore R. and attended school events. In addition, the mother helped Noah with his homework after school. The mother visited Noah when he was in the hospital and attended his most recent medical appointment. Noah and Jose were bonded with the mother and the maternal family. Ms. Chakrabarti stated both Noah and Jose recognized the mother as their "mom."

The mother testified on her own behalf. The mother went to the grandmother's home every day at 7:15 a.m. to help Noah get ready for school. She helped Noah comb his hair, brush his teeth and dress for school. The mother made Noah breakfast and dropped him off to school with her family. She visited Noah's school twice, for the first

day of school and the "back to school" night.  The mother testified she and the maternal family helped Noah with his homework.  The mother stated:  "We all do it together.  I mean one day I'll do it or my mom will do it.  The next day it's kind of joined together.  We all participate."  The mother attended some of Noah's medical appointments.  The mother visited Noah every day during visiting hours when Noah spent a week at the hospital.  She would go home after 8 p.m. while the maternal grandmother stayed with Noah at the hospital.  Noah had a followup visit after he was discharged from the hospital but the mother did not attend the medical appointment.  When the mother was asked who made the decision to take Noah to the hospital, the mother replied:  "My mom's, of course, and you know basically everybody.  You know we wanted what was best for him, you know."  The mother testified the maternal grandmother asked for the mother's input when Noah was sick.  The mother stated, "She asked me if I would just go to the hospital with them.  I said absolutely."

The mother testified she spent time with Jose during the day while monitored by the maternal family.  She played and did activities with Jose including watching Disney learning shows and "Frozen" with him.  The mother prepared food, fed Jose and bathed him.  She also attended some of Jose's medical appointments.

The mother stated Noah enjoyed spending time with her.  She testified: "[H]e tells me how much he wants to come home and how much he wants to be with me.  When I have to leave, he does not want me to leave."  The mother added, "I usually leave around 8:15, try to put him to sleep at night, but he is frustrated because I have to go."  The

10

mother put Noah to bed four days out of the week. The mother testified Jose would cry when she left for the night.

The juvenile court asked the mother, "So you're basically there all of the time?" The mother answered, "As much as I can be." The court queried, "Well if you're there all of the time, when do you go to your drug program?" The mother replied, "I have not started, sir."

## IV. DISCUSSION

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child. (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53; *In re Marilyn H.* (1993) 5 Cal.4th 295, 304.) Our Supreme Court has summarized the juvenile court's options at the section 366.26 hearing: "In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care. (§ 366.26, subd. (b).) Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.' (§ 366.26, subd. (c)(1).)" (*In re Celine R., supra*, 31 Cal.4th at p. 53; *In re K.H.* (2011) 201 Cal.App.4th 406, 414; *In re Hector A.* (2005) 125 Cal.App.4th 783, 790-791.)

11

One exception to adoption is the beneficial parental relationship exception. This exception is set forth in section 366.26, subdivision (c)(1)(B)(i) which states: "[T]he court shall terminate parental rights unless either of the following applies: . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) The mother has the burden of proving her relationship with the children would outweigh the well-being they would gain in a permanent home with an adoptive parent. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1165; *In re K.P., supra*, 203 Cal.App.4th at p. 621.) Evidence of frequent and loving contact is not enough to establish a beneficial parental relationship. (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 645; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316.) The mother also must show she occupies a parental role in the children's lives. (*In re G.B., supra*, 227 Cal.App.4th at p. 1165; *In re K.P., supra*, 203 Cal.App.4th at p. 621.)

Appellate courts have adopted differing standards of review for the parental relationship exception determination. Many courts review for substantial evidence. (*In re G.B., supra*, 227 Cal.App.4th at p. 1165; *In re S.B.* (2008) 164 Cal.App.4th 289, 297; *In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333-1334; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) Other courts have applied an abuse of discretion standard of review. (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) More recently, courts have adopted both the substantial

12

evidence and abuse of discretion standards of review.  (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395; *In re J.C.* (2014) 226 Cal.App.4th 503, 530; *In re K.P., supra*, 203 Cal.App.4th at pp. 621-622; *In re Bailey J., supra*, 189 Cal.App.4th at pp. 1314-1315.)  In evaluating the juvenile court's determination as to the factual issue of the existence of a beneficial parental relationship, these courts review for substantial evidence.  (*In re Anthony B., supra*, 239 Cal.App.4th at p. 395; *In re J.C., supra*, 226 Cal.App.4th at p. 530; *In re K.P., supra*, 203 Cal.App.4th at p. 622; *In re Bailey J., supra*, 189 Cal.App.4th at p. 1314.)  But whether termination of the parental relationship would be detrimental to the child as weighed against the benefits of adoption is reviewed for abuse of discretion.  (*In re Anthony B., supra*, 239 Cal.App.4th at p. 395; *In re J.C., supra*, 226 Cal.App.4th at pp. 530-531; *In re K.P., supra*, 203 Cal.App.4th at p. 622; *In re Bailey J., supra*, 189 Cal.App.4th at p. 1315.)  No error occurred under any of these standards of review.

It is undisputed the mother maintained regular visitation and contact with the children.  The mother visited the children daily.  She helped Noah get ready for school, prepared him breakfast, took him to and from school, and helped him with homework.  In addition, the mother took daily care of Jose by preparing and feeding him food, bathing him and playing with him.  The children were bonded with their parents and the maternal family.  The juvenile court found, "It is clear that the parents have had regular consistent visitation and contact and do have a parental role and relationship in the children's lives. . . ."

But the trial court concluded the mother failed to show termination of her parental relationship would be detrimental to the children when weighed against the benefits of

adoption. The mother challenges this ruling. She contends the juvenile court should have ordered a permanent plan of legal guardianship, rather than adoption, given the strong beneficial parental relationship she has with the children. The mother asserts the juvenile court erred by focusing on the parents' failure to comply with reunification services and inability to provide a home for the children. The mother's contentions are without merit.

The mother fails to show her beneficial relationship with the children would outweigh the well-being they would gain in a permanent home with the maternal grandmother. (*In re G.B., supra*, 227 Cal.App.4th at p. 1165; *In re K.P., supra*, 203 Cal.App.4th at p. 621.) The mother did not occupy a parental role such that termination of her parental rights would be detrimental to the children. When the children were first detained in October 2013, they were released to the mother's custody over the department's objection. During the time the children were in the mother's custody, she appeared overwhelmed and did not follow up on family preservation services. The mother failed to take Noah for tutoring and for speech therapy evaluation. Ms. Raya from the Duarte child center reported: "[I]t has been a real, real struggle to work with them. The child is always late. Mom knows that the child will be going to kinder, but the child is never here in school. He was supposed to be tested for services, but since the child is never here, they already missed 2 appointments. I always call mom and she never picks up." On July 30, 2014, the children were detained again after the mother tested positive for methamphetamine and amphetamine. While the mother visited frequently and participated in the children's care after they were placed with the maternal

14

grandmother, the mother's visits were monitored. The maternal grandmother was the children's primary caregiver. The maternal grandmother took Noah for speech therapy evaluation and ensured his educational needs were met. The maternal grandmother also made medical decisions for the children. The mother testified the maternal grandmother decided to take Noah to the hospital when he was sick and stayed overnight with him when he was there for a week. The mother acknowledged the children were doing "wonderful" under the maternal grandmother's care. The mother stated she was grateful Noah had a set school schedule and structure in his life.

Furthermore, the juvenile court could properly focus on the mother's unresolved substance addiction issues because the children became dependents of the court due to her drug abuse. It is undisputed the mother failed to comply with court orders to attend individual, alcohol and drug counseling, parenting classes and narcotics testing. The mother tested positive for cannabinoids on March 10, 2104. Of the 14 random drug tests from March 25, 2014 to July 14, 2014, the mother missed 12 tests. The mother tested positive for methamphetamine and amphetamine on July 23, 2014 when she came for intake at a substance abuse treatment program. After the positive drug test, the mother missed all 11 drug tests from August 2014 to February 2015. The department was unable to determine if the mother was drug free because she refused to test after the July 2014 positive drug test. The mother admitted she had no excuse. She stated she lacked motivation to start the court-ordered programs. The section 366.26 report states, "Mother and father appear to have done nothing towards rectifying the situation which led to

15

[department] involvement . . . ." Further, the mother admitted at the section 366.26 hearing that she had not started her drug treatment program.

The mother relies on *In re S.B.* (2008) 164 Cal.App.4th 289, 298-301 (*S.B.*) to support her contention that the beneficial parental relationship outweighs any need for adoption. The mother's reliance is misplaced. In *S.B.* the father admitted to using methamphetamine "on and off" for 30 years. (*S.B.*, *supra*, 164 Cal.App.4th at p. 293.) The child was removed from the father's custody. Thereafter, the father complied with every aspect of his case plan including maintaining his sobriety. (*Ibid*.) The department reported the father made "'consistent efforts to alleviate and or mitigate the reasons his family was brought to the attention of the court.'" (*Id.* at p. 294.) In concluding the beneficial parental relationship applied, the Court of Appeal reasoned the father's full compliance with the case plan evidenced complete devotion to the child's welfare. (*Id.* at pp. 300-301.)

In a later case, *In re Jason J.* (2009) 175 Cal.App.4th 922, 937, the same appellate court limited *S.B.* to its particular facts. (See *In re J.C., supra*, 226 Cal.App.4th at p. 530.) In *Jason J.*, the Fourth Appellate District, Division One explained: "In [*S.B.*], this court reversed an order terminating the father's parental rights over his daughter, S.B., under the parent-child beneficial relationship exception to adoption. The parties agreed the father maintained regular, consistent and appropriate visitation with S.B., and the evidence showed he was S.B.'s primary caretaker for three years; when she was removed from his custody he immediately acknowledged his drug use was untenable, started services, maintained his sobriety, sought medical and psychoanalytic services and

16

complied with every aspect of his case plan; after a year apart S.B. continued to display a strong attachment to her father; and she loved her father and wanted their relationship to continue. (*Id*. at p. 298.) This court concluded the 'record here fully supports the conclusion [the father] continued the significant parent-child relationship *despite* the lack of day-to-day contact with S.B. after she was removed from his care.' (*Id*. at p. 299.) The opinion states, 'S.B. loved her father, wanted their relationship to continue and derived some measure of benefit from his visits.' (*Id*. at pp. 300–301.) The *S.B*. opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*In re Jason J.*, *supra*, 175 Cal.App.4th at p. 937.)

In the case of *In re C.F.* (2011) 193 Cal.App.4th 549, 558-559, the same appellate court stressed: "[W]e once again emphasize that *S.B.* is confined to its extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact." (See *In re J.C., supra*, 226 Cal.App.4th at p. 530.) In *C.F.,* the Fourth Appellate District, Division One rejected the mother's reliance on *S.B.* because the facts were readily distinguishable. (*In re C.F., supra*, 193 Cal.App.4th at p. 558.) The Court of Appeal explained, "[The mother] did not maintain her sobriety. She resumed drug use and lost custody of her children after the reunification period ended. She made no showing the termination of parental rights would cause the children any detriment." (*Ibid.*)

17

Like the parent in *C.F.*, the mother did not comply with the court ordered case plan. The mother did not start her substance abuse treatment program and repeatedly failed to undergo drug testing. As in *C.F.*, the mother did not maintain her sobriety and lost custody of her children after she resumed drug use. Like *In re C.F.*, the facts here are readily distinguishable from *S.B.* The father in *S.B.* fully complied with his case plan while the mother here disregarded the court orders.

In her reply brief, the mother asserts there is no evidence she continued using drugs after her positive test on July 23, 2014. Although there is no direct evidence of continued drug use, the mother missed all 11 drug tests after her July 2014 positive test. Under these circumstances, the juvenile court could reasonably infer the mother's failure to comply with a court-ordered drug test may be considered as a positive test. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 104 & fn. 5; see also *In re N.M.* (2003) 108 Cal.App.4th 845, 857 [parents obligated under case plan to prove abstinence from illegal drugs].) This is not a case where there is a reasonable explanation for missing a test; e.g. a parent gets off work late and belatedly arrives at a testing facility. A juvenile court, under those manifestly innocent circumstances, could decline to view the failure to appear for a drug test as a sinister effort to evade responsibility. However, the juvenile court could reasonably conclude that common sense suggests a parent who consistently fails to appear for drug tests does so because of a consciousness of guilt. (*People v. Roberts* (1992) 2 Cal.4th 271, 310-311 [no error occurred because the trial court instructed the jury it could infer a consciousness of guilt from the defendant's refusal to take a blood test]; *People v. Municipal Court (Gonzales)* (1982) 137 Cal.App.3d 114,

18

118-119 [evidence of a refusal to undergo a blood alcohol test is evidence of a consciousness of guilt]; *People v. Roach* (1980) 108 Cal.App.3d 891, 893 [refusal to undergo a narcotics test in a driving under the combined influence of alcohol and drugs prosecution is evidence of consciousness of guilt].)  Moreover, the mother's long-standing drug abuse is in stark contrast to that in *S.B.*  And her drug abuse is evidence continuing the parent-child relationship would not be *beneficial*. The juvenile court, under any standard of review, could conclude the evidence was insufficient to demonstrate termination of the mother's parental rights would be detrimental to the children.

V.  DISPOSITION

The order terminating parental rights is affirmed.

**CERTIFIED FOR PUBLICATION**

TURNER, P. J.

I concur:

KUMAR, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

In re Noah G., et al.

B268442

BAKER, J., Concurring

I join the majority's opinion, except its discussion of the circumstances in which a trial court may consider a missed drug test to be equivalent to a positive drug test. In my view, we need not opine on the circumstances under which a trial court may infer consciousness of guilt from the failure to submit to drug testing in order to resolve the issues before us. Rather, it is mother A.R.'s failure to seek treatment for a longstanding drug problem, including drug testing that is customarily a core component of such treatment, that stands this case in stark contrast to *In re S.B.* (2008) 164 Cal.App.4th 289 and undercuts the showing mother attempted to make in support of invoking the beneficial parent relationship exception.

BAKER, J.