Filed 7/7/21  In re Steven M. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re STEVEN M., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> L.G., <br><br> Defendant and Appellant. | A160705 <br><br> (Alameda County <br> Super. Ct. No. JD-029952-01) |

Mother appeals an order terminating her parental rights and selecting adoption as the permanent plan for her now four-year-old son. She contends the court erred in finding that the "parental-benefit" exception to the termination of parental rights does not apply. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] After the trial court's order was entered, the California Supreme Court issued its decision in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), in which the court provided new guidance regarding the "carefully calibrated process" designed by the Legislature for determining parental rights when a parent asserts that the parental-benefit exception

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

1

applies. Given some ambiguity in the record before us, we are unable to conclude that the court's decision complies with the Supreme Court's directions in *Caden. C.* Accordingly, we shall reverse the order terminating parental rights and remand for reconsideration in light of *Caden C.*

**Background**

In July 2018, the Alameda County Social Services Agency (the agency) filed a juvenile dependency petition alleging that then 16-month-old Steven came within section 300, subdivision (b)(1) based on, among other things, allegations that his parents had a history of domestic violence and substance abuse. Steven was detained and placed with his maternal grandmother shortly after his detention.

In September 2018, the court sustained the allegations of the petition and ordered family reunification services for both parents.

By the time of the six-month review hearing in May 2019, after a slow start, mother had begun participating in domestic violence and substance abuse prevention services but the parents' relationship continued to be characterized by domestic violence. On four occasions in the preceding five months, the domestic disputes resulted in police involvement. The court terminated reunification services and set a section 366.26 hearing.

In the section 366.26 report, dated November 12, 2019, the agency recommended the termination of parental rights and permanent plan of adoption by the maternal grandmother. The agency reported that mother is visiting with Steven twice a week at the grandmother's home. The grandmother reported that the visits were "very positive" and that mother was appropriate and affectionate with Steven and attended to his needs by feeding, changing, and putting him down for naps and for the night, reading to him, playing with him, and watching cartoons and videos with him.

2

Mother and Steven also were participating in weekly dyadic therapy sessions. The agency reported that the transitions after mother's visits had become increasingly difficult.

At the contested section 366.26 hearing, conducted over several days in November 2019 and February 2020, the grandmother testified that in addition to the scheduled visits, Steven communicates with his mother by phone or FaceTime at least once a week and sometimes as much as "every day." Mother testified that when she arrives for visits, Steven says "mama," runs to the door, and hugs her. When visits end, Steven reacts by asking to go to her house and crying.

Mother acknowledged that her domestic violence has impacted Steven. She testified that he panics and runs to her when he hears loud noises. She also acknowledged the grandmother takes care of Steven on a day-to-day basis and that Steven feels comfortable with and loves his grandmother.

Mother testified that she and father were no longer in a romantic relationship. Father confirmed that they were no longer in a relationship but acknowledged that they are co-parenting. The grandmother testified that she was unsure if mother and father were still in a romantic relationship, but suspected there had been a recent altercation between the two based on a scratch she observed on mother's face in January 2020. The social worker testified that she was not aware of any domestic violence incidents occurring after May 2019. Grandmother also testified that she was willing to consider long-term guardianship for Steven and would "be whatever Steven needs," and do "whatever the judge decides."

Following a number of continuances, the matter was decided in August 2020. The court terminated parental rights and selected adoption as the permanent plan. The court found that Steven is adoptable and that the

3

parental benefit exception did not apply. The court found that mother visited regularly and consistently, but that "there are certain things that mother did not do during the time period of this case, including go to Steven's medical appointments with him." The court also noted that family reunification was terminated for failure to comply with the case plan and "recognizing" that mother "was very young when [Steven] was born," the court observed that "there's a lot of lack of life and greater world experience and relationships and parenting and such that the mother, from the record, lacks." The judge emphasized that she "really strove to look deeply at any exceptional circumstances that might apply for the mother, any exceptional circumstances that might exist in this record such that she had demonstrated to this court why her parental rights should not be terminated" but that she could not "find a benefit to Steven of maintaining the parent/child relationship that outweighs the benefit of adoption." The court continued, "I think that the mother loves Steven dearly, [but] . . . that is not the issue for the court to decide. And I don't question the love. But I don't believe that the evidence demonstrates that Steven would benefit from the ongoing parental relationship with mother, . . . that would outweigh the benefits of adoption." The court found that mother had not "demonstrated that the child would suffer and that there would be a detriment to the child to sever the relationship." To the contrary, the court concluded that "the benefit [of the relationship], if any, is only to the mother, and it's not to Steven."

Mother timely filed a notice of appeal.

## Discussion

The purpose of the section 366.26 hearing is to select a permanent plan for the child after reunification efforts have failed. (§ 366.26(b); *In re Marilyn H.* (1993) 5 Cal.4th 295, 304.) Adoption, where possible, is the permanent

4

plan preferred by the Legislature for a dependent minor child who has not been returned to the custody of his or her parents and is found by the court to be adoptable. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) When the court finds that a child is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless "the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.)

Here, mother contends the court erred in finding that the "parental-benefit" exception does not apply. (§ 366.26, subd. (c)(1)(B)(i).) In *Caden C.* the court explained, for this exception to apply, a parent is required to show "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would benefit the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra,* 11 Cal.5th at p. 631.) "The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Id.* at p. 632.) "As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*, quoting *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) "Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Id.* at p. 633.)

The court's decision in *Caden C.* focuses primarily on the third element. The court rejected reliance on whether the parents have complied with their case plan and explained, "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citation.] . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression [or] . . . a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid*.) "In each case, then, the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Caden C.*, *supra,* 11 Cal.5th at p. 633, quoting *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

The court emphasized, "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent. [Citation.] Accordingly, courts should not look to whether the

parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home. [Citation.] Even where it may never make sense to permit the child to live with the parent, termination may be detrimental. [Citation.] And the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver. [Citation.] [¶] What's more, understanding the harm associated with severing the relationship is a subtle enterprise—sometimes depending on more than just how beneficial the relationship is. In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home. [Citation.] A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship. Sometimes, though, a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C.*, *supra,* 11 Cal.5th at p. 634.)

Finally, the court set forth the applicable standard of review. As to the first two elements, the substantial evidence standard of review applies. "The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra,* 11 Cal.5th at pp. 639-640.) "The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing

7

visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence. [Citations.] [¶] Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. The decision is not the same as a determination whether to transfer the child from the custody of one caregiver to another, but it does require assessing what the child's life would be like in an adoptive home without the parent in his life. [Citation.] The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Id*. at p. 640.)

Here, there is no dispute that Steven is adoptable and that mother has maintained regular visitation with her son sufficient to satisfy the first requirement for application of the exception. With respect to the second and third requirements, however, although the trial judge thoughtfully weighed Steven's best interests, we cannot be certain that improper factors were not considered.

8

In explaining its ruling, the trial court made reference to the fact that mother had failed to complete her case plan. In *Caden C.*, the court explained that a "parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Caden C.*, *supra,* 11 Cal.5th at p. 638.) The court held that "[p]arents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Id*. at p. 637 & fn. 6, disapproving *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1304 [parents must show that they are actively involved in maintaining their sobriety or complying substantially with their case plan to establish the parental-benefit exception].) Here, the court cited *In re Noah G.* in permitting the agency to introduce evidence at the section 366.26 hearing that mother had failed to complete her case plan and resolve the issues that led to the dependency. The court noted that under *Noah G.* even a beneficial parental relationship would not support application of the exception to adoption where the parents have not ameliorated the causes for removal. The trial court's explanation also referenced "short-comings" in mother's parenting skills and notes that the grandmother did not "even think her daughter was able to parent full-time." While the court's rationale in many respects was consistent with the criteria set out in *Caden C.*, we are uncertain what weight, if any, the court placed on factors proscribed by the Supreme Court. Particularly in view of the importance of the parental relationship, we deem it prudent to remand for reconsideration so that the trial court can make its findings with the benefit of the guidance provided in *Caden C.*

## Disposition

The order terminating parental rights is reversed and the matter remanded for reconsideration.[2]


POLLAK, P. J.

WE CONCUR:

TUCHER, J.
BROWN, J.

---

[2] There is no dispute that the court found that Steven is not an Indian child. To the extent the wrong boxes were checked in the court's order, that can be corrected on remand.