Filed 12/17/21  In re Wyatt B. CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re WYATT B., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. STEPHANIE S., Defendant and Appellant. | G060123 (Super. Ct. No. 19DP0223) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Robert Gerard, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*     \*     \*

## INTRODUCTION

Under Welfare and Institutions Code section 366.26[1], subdivision (c)(1)(B), a juvenile court may decline to terminate parental rights even if it is likely a dependent child will be adopted. To do so, it must find termination would be detrimental to the child under certain enumerated exceptions. At issue here is the proper application of the parental benefit exception under section 366.26, subdivision (c)(1)(B)(i). Should the juvenile court determine the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" such that termination would be detrimental, it can preserve parental rights. (§ 366.26, subd. (c)(1)(B)(i); see also *In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

This case sadly demonstrates the wisdom of the old saying "Sometimes love isn't enough." It also illustrates how difficult and important is the work done by trial judges in these cases. The record revealed, and the trial court expressly acknowledged, that mother and child had a loving relationship. But the court found the benefit of continuing the relationship was not enough to overcome the disruption it would create in his prospective adoptive home. In light of *Caden C.*, which was handed down after the juvenile court's ruling, Mother appeals this judgment, concerned the court was improperly considering her personal struggles in making its determination. We find the ruling does not conflict with *Caden C.* and was supported by substantial evidence; thus, we affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

**FACTS**

On February 21, 2019, the Orange County Social Services Agency (SSA) filed an application for a protective custody warrant to remove Wyatt B., then five years old, from the custody of his parents, Stephanie S. (Mother) and Thomas B. (Father). SSA had received a referral on February 8, 2019, indicating the child was wandering outside alone late at night. Mother had left the child in the care of her roommate, who had "passed out drunk on the couch," and the child had been able to slip outside to look for her.

Mother reportedly often left Wyatt unsupervised. Sometimes she would leave him with her roommate, who drank frequently, and other times, she would be unable to supervise him herself. Mother had a substance abuse problem, including methamphetamine, opiates, and marijuana, and Wyatt had lived a very transient lifestyle in her care as a result of her issues, drifting from place to place, sometimes camping outside. At the time of the referral, father's whereabouts were unknown.[2]

When Mother and Father were together, SSA received 13 referrals about the family, three of them substantiated as to Wyatt.[3] The referrals were for domestic violence between the couple, including one incident in which Wyatt was in Father's arms, as well as substance abuse.[4] The family had been offered voluntary family services in 2016, but neither Mother nor Father took advantage of those services, and they were terminated in July 2016.

The protective custody warrant issued for Wyatt, and he was ordered detained on February 26, 2019. On the day he was taken into custody, he reported he did not always have enough food while living with Mother, and he would eat paper when he

---

[2]   SSA was eventually able to locate Father in the men's central jail in Santa Ana. He remained incarcerated throughout the proceedings.

[3]   Mother has an older daughter who lived with them for a time. The maternal grandmother obtained legal guardianship over her.

[4]   Father had an active restraining order protecting him from Mother which was set to expire on December 19, 2019.

had no food. Nevertheless, he felt she was a special person in his life and felt safe with her.

A jurisdictional and dispositional hearing was set for April 10, 2019. Wyatt was placed with foster parents and Mother was given eight hours of supervised visitation per week.

Mother continually seemed to ask for help in obtaining treatment for her substance abuse problems but would ultimately fail to follow through. She was denied admission into one program because she was still using. She walked out of another residential treatment program after one week. She refused to undergo court-ordered drug testing, and would not commit to engaging in reunification services. She felt her previous participation in services in 2009 was sufficient. Social workers were concerned Mother was putting other personal priorities ahead of addressing her case plan.

Despite this, SSA told the juvenile court it wanted to continue trying to engage Mother in services to help her reunify with Wyatt because she had maintained visits with him. At the jurisdictional hearing, Mother pleaded no contest to the allegations in the dependency petition, and the court ordered continued placement in foster care with a six-month prepermanency planning review to take place in October 2019.

SSA filed a status review report on October 18, 2019, indicating Wyatt had been placed with his paternal great aunt, Valerie W., in May 2019. Mother was homeless by this time so social workers had difficulty contacting her. Then, in August 2019, she was taken into custody on misdemeanor drug charges.

She was not engaging in services but was still attending her visitation, although Valerie usually had to initiate visits. The social worker observed during one visit that Mother appeared somewhat childlike in her demeanor. Wyatt looked forward to seeing her and did not display any distress about visits, but Mother was making very little or no progress with her issues.

4

Meanwhile, concerns were brewing about Wyatt's placement with Valerie. Valerie had never been a certain candidate for placement as she had indicated she was unsure about having her grand-nephew permanently. In July 2020 during a visit, Mother was able to make off with Wyatt when Valerie's attention was elsewhere. Mother was eventually apprehended by police and charged with felony child stealing. A three-year criminal protective order was entered, prohibiting her from having any contact with Wyatt. Mother claimed she absconded with Wyatt because she was protecting him from physical discipline imposed by Valerie. After Mother's arrest, Wyatt was placed in temporary protective custody pending a new placement.[5]

The court terminated reunification services and set a selection and implementation hearing under section 366.26 for December 15, 2020. By this time, Wyatt was with foster parents, Hope and Jonathan. Even though he was doing well with them, Hope and Jonathan were already in the process of adopting another child, and could not commit to permanency. Therefore, a new foster family was assessed and Wyatt was permitted to meet with them.

In October 2020, the criminal protective order against Mother was modified to allow her visitation with Wyatt consistent with rulings in the dependency case. The first time Wyatt and Mother visited after that, he jumped into her arms and they held each other for a long time. Some visits were very positive, with Mother bringing him gifts. But Mother was involved in a motorcycle accident at some point which left her temporarily non-ambulatory, and she came to some visits in a wheelchair. This situation made her understandably more emotional at one visit. At another visit, one of the foster parents was present and witnessed Mother failing to observe COVID-19 protocols and being aggressive.

---

[5]     SSA received a child abuse referral about Valerie shortly after the July 2020 incident. It was reported Valerie spanked Wyatt three times during the visit with Mother and SSA made the decision not to return him to Valerie's care.

The selection and implementation hearing began on December 15, 2020. The juvenile court deemed Wyatt adoptable and ordered SSA to make efforts to locate an appropriate adoptive family. It set another hearing on the matter for March 2021.

In late December 2020, Wyatt was placed with a prospective adoptive parent. After this, the assigned social worker noticed he was more distant with Mother at visits, one time responding "Okay" when she told him she loved him. Wyatt indicated a desire to be adopted by the prospective adoptive parent and had quickly created a very positive relationship with the new family.

But as the time grew closer for a decision to be made as to whether Mother's parental rights would be terminated, Wyatt began to act out. He had had several positive visits with Mother in which she had brought science kits and other educational activities for them to do together. Then in late February, the foster parent said Wyatt had some behavioral difficulties in school, around the time the social worker and his attorney had been to the foster parent's home for a visit. She was concerned that visits with Mother were impacting Wyatt's ability to assimilate into her home.

When the selection and implementation hearing continued, Father testified from prison that Wyatt and Mother had a close bond and Wyatt had slept with her from birth. Mother subpoenaed Wyatt to testify about their relationship but the juvenile court felt it would be unnecessarily stressful for the child when the SSA reports documented his positive and loving feelings for his mother.

Mother then testified. She said she had been homeless for two years prior to Wyatt's removal, and was unable to provide the kind of home for Wyatt she wished to provide. Yet she still felt she was a good mother in her own way: "I'm not a good provider of the house. I'm a good provider of a home. There's some fundamental things that I guess I lack. Loving him [Wyatt] wasn't one of them." She felt the foster father was leery of her and made Wyatt more guarded in his conversations with her.

In a ruling from the bench, the juvenile court terminated both Mother's and Father's parental rights, finding the parental benefit exception did not apply. While the Mother had an adequate number of visits, visits were initially inconsistent and then, the court noted, she absconded with Wyatt. As for what the juvenile court called the "second and third prongs of the analysis," Mother's positive interactions with Wyatt did not outweigh the benefits to him of having a stable adoptive home. The court was cognizant of Wyatt's loving feelings toward Mother, but concluded this was not enough to invoke the exception. Balancing the prospective benefits of maintaining Mother's relationship with Wyatt against the security of his new home and life, the court felt it was in Wyatt's best interest to terminate the parental rights of Mother and Father. It ordered adoption as the permanent plan. Mother and Father were given the opportunity to have goodbye visits with Wyatt and write him letters expressing their feelings toward him.

## DISCUSSION

Mother contends the juvenile court erred for two reasons. First, she says it made an error of law – it considered her failure to reunify with Wyatt in deciding whether to apply the parental benefit exception; a consideration later found in *Caden C.* to be improper. Second, she argues, substantial evidence does not support the order terminating her parental rights. We must disagree on both counts.

*Caden C.* clarified that we must undertake a hybrid standard of review in cases involving the parental benefit exception. A "substantial evidence standard of review applies to the first two elements" of the analysis – that is, whether the parent has maintained regular visitation and contact and whether continuing the relationship would benefit the child. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) The third element involves a mixed standard of review. Factual determinations underpinning whether termination would be detrimental are "properly reviewed for substantial evidence." (*Id.* at p. 640.) But the trial court's ultimate assessment and weighing of detriment is subject to abuse of discretion review. (*Ibid.*)

7

In addition to clarifying the standard of review for parental benefit exception cases, *Caden C.* held a parent "need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Id*. at p. 637.) The high court disapproved cases holding to the contrary, such as *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1304 (*Noah G*.). (*Caden C.*, *supra*, 11 Cal.5th at p. 637, fn. 6.) Mother points out the trial court stated at one point on the record it was "relying on" *Noah G*. in balancing the beneficial parent relationship against the security of moving forward with adoption. Additionally, she notes the trial court thought her efforts of late to occupy a maternal role for Wyatt "fall within the category of really too little, too late given the long history of this case[.]" She contends the trial court was holding her failure to complete her case plan against her, which she believes *Caden C.* prohibits. To properly evaluate this argument, some discussion of *Noah G.* and *Caden C.*, particularly how they intersect, is required.

In *Noah G.*, a mother's parental rights were terminated after she failed, like Mother here, to engage in drug treatment services. There was evidence in the record the children were bonded and had a loving relationship with their parents and maternal family. (*Noah G.*, *supra*, 247 Cal.App.4th at p. 1301.) However, the mother failed "to show her beneficial relationship with the children would outweigh the well-being they would gain in a permanent home with the[ir] maternal grandmother." (*Ibid*.) The mother did not exhibit parental tendencies such as taking the children for speech therapy and tutoring. The maternal grandmother who wished to adopt them occupied more of that role. She made medical decisions for them, attended to their educational needs, and even took one child to the hospital and stayed with him during treatment. The mother's visits with the children were monitored, and she was grateful the grandmother could provide structure in the kids' lives. (*Id.* at pp. 1301-1302.) *In addition*, the *Noah G.* court felt it was appropriate for the juvenile court to consider the mother's failure to resolve the

8

issues that led to the dependency in its beneficial relationship and detriment analysis. (*Id.* at p. 1302.)

*Caden C.* only disapproved the latter aspect of the *Noah G.* opinion; it disapproved putting any burden on the parent to show active involvement in or substantial compliance with her case plan to establish the parental benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) But *Caden C.* recognized that "issues such as those that led to dependency often prove relevant to the application of the exception" to the extent "they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* at pp. 637-638.) In some cases, a parent's failure to address those issues could have a negative effect on the relationship. And on the other hand, a parent's efforts to ameliorate those issues could positively impact the relationship. (*Ibid.*) Thus, by no means was *Caden C.* suggesting a juvenile court may never consider a parent's failure to address issues leading to dependency. To the contrary, such considerations are permissible, but only when relevant to the three-pronged analysis the court must make. And *Noah G.* was disapproved only to the extent it allowed such considerations to drive a juvenile court's analysis.

Here, the juvenile court was clearly relying on *Noah G.* when it balanced the beneficial relationship between Wyatt and Mother and the benefits of a stable adoptive home; this was the context in which it mentioned *Noah G.* Like the mother in *Noah G.*, Mother here was not occupying key aspects of a parental role. She never attended medical appointments and expressed little interest in making educational decisions for Wyatt. Wyatt's foster mother seemed to prioritize him in her life, something Mother had been unable to do for years. Mother described the reunification period as a "break" from her responsibilities. Observers remarked that she often acted as more of a peer to Wyatt than a parent.

9

Substantial evidence supported the decision terminating Mother's parental rights in our view. Despite a few hiccups, especially around the time of the section 366.26 hearing, Wyatt was acclimating well to his prospective adoptive home and bonding to his adoptive family. He was doing well in school despite being diagnosed with Attention Deficit Hyperactive Disorder and other behavioral issues in May 2020. His prospective adoptive parents had earnestly reflected and reached the conclusion they could make a positive impact on Wyatt's life and wanted to be a family. And while Mother clearly loved her son, she seemed to blame him for the dependency case. During a video visit on December 16, 2020, SSA reported Mother became emotional and said if Wyatt had not gone to the next door neighbor's house back in February 2019, they would not be in their present situation. During her testimony at the hearing, Mother denied she was trying to blame Wyatt, but did not deny making the statement reported, and the trial court was entitled to consider Mother's tendency to talk to Wyatt in this way a potential detriment that could undermine his adoptive placement.

We also note there was friction between Mother and the prospective adoptive parents, exemplified by the way the prospective adoptive mother, shortly after Wyatt's school outburst, described his visits with mother as "Disneyland visits" which were problematic given their structured lifestyle. While the prospective adoptive mother later admitted she felt "bad" for saying this, the comment shows the potential for significant disruption to Wyatt's new life, and significant conflict between his biological mother and his adoptive parents, if he were to continue contact with mother.

Though we affirm the juvenile court's conclusion, we are nonetheless painfully aware of the emotional weight of our decision. We do not mean to question Mother's or Father's love for Wyatt. But our duty – as was the trial court's – is to try to protect Wyatt's best interests. He needs and deserves a chance to move on and move

10

forward.  We cannot find an abuse of discretion in the trial court's decision that, as difficult and heart-wrenching as it is and will be, cutting ties with Mother is the best way for him to do that.

**DISPOSITION**

The judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


ZELON, J.*


*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.