Filed 1/12/22  In re D.P. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.P., a Person Coming Under the Juvenile Court Law. | |
| MERCED COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.P. et al.,<br><br>Defendants and Appellants. | F083084<br><br>(Super. Ct. No. 19JP-00106A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Donald J. Proietti, Judge.

Susan M. O'Brien, under appointment by the Court of Appeal, for Defendant and Appellant S.P.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant E.P.

Forrest W. Hansen, County Counsel, and Jennifer Tran, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

S.P. (mother) and E.P. (father) appeal an order terminating their parental rights to their now seven-year-old daughter, D.P., and selecting adoption as the child's permanent plan under Welfare and Institutions Code section 366.26.[1]  Mother and father contend that the juvenile court erred in finding that the beneficial parent-child relationship exception to the termination of their parental rights did not apply.  (§ 366.26, subd. (c)(1)(B)(i).)  Two days after the May 25, 2021, section 366.26 hearing, the California Supreme Court decided *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), in which the court provided new guidance regarding how the beneficial parental-child relationship exception should be applied.  Although we recognize it is in D.P.'s interest to expeditiously select her permanent plan, we cannot determine on the record before us that the juvenile court's ruling complied with the principles announced in the Supreme Court's decision.  Accordingly, we will reverse the order terminating parental rights and remand this matter for a new section 366.26 hearing in light of the legal standards articulated in *Caden C.*

## STATEMENT OF THE CASE AND FACTS

***Background***

Four-year-old D.P. came to the attention of the Merced County Child Welfare Services Agency (agency) in the middle of July 2019, when it was alleged that mother and father were living in a condemned warehouse.  Mother and father initially minimized their drug use, although mother admitted to using methamphetamine approximately three times a week since she was 15 years old.  Father denied  drug use and was confident his drug screening would be negative for all substances.  Both mother and father were asked to complete a drug screening, consisting of a urine and hair follicle test.  Both tested positive for methamphetamine on July 16, 2019, and a few weeks later on August 1,

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2019. Mother admitted she used methamphetamine the week of August 15, 2019. When father was shown his urinalysis results, he admitted to methamphetamine use and stated that he used approximately once a week.

Mother and father were offered a safety plan, to which they agreed and signed on July 16, 2019. The safety plan consisted of the parents maintaining contact with the agency regarding their whereabouts, and refraining from substance use while caring for D.P.

At the end of July 2019, mother and father were offered voluntary family maintenance services. However, they did not cooperate, refusing to drug test and communicate with the agency.

Mother and father had prior child welfare history in Alameda County in 2014, when it was reported that both D.P. and mother tested positive for amphetamine, methamphetamine and marijuana at the time of D.P.'s birth. Mother and father were offered voluntary family maintenance services but failed to meet their case plan goals.

***Detention***

The agency filed a section 300 petition on August 21, 2019. At the detention hearing August 22, 2019, mother and father both denied the allegations of the petition but submitted on the recommendation of the agency for purposes of the hearing. D.P. was detained and jurisdiction/disposition set for September 12, 2019.

***Jurisdiction/Disposition***

The report filed for the jurisdiction/disposition hearing recommended that the juvenile court take jurisdiction over D.P. and offer family reunification services to mother and father.

D.P., now five years old, was interviewed and asked if she knew what drugs were. She stated that they were " 'bad' " and that " 'daddy and mommy never do drugs.' " But she also stated that " 'daddy and mommy only do drugs because they need a home.' "

3.

At the jurisdiction/disposition hearing September 12, 2019, mother and father denied all allegations, but submitted on the recommendations of the agency. The juvenile court removed D.P. from mother and father's custody, finding a substantial danger to D.P.'s health, safety, and welfare if she were returned home. Mother and father were both ordered to complete service plan agreements. Mother's plan consisted of participating in team meetings, finding stable housing, undergoing a drug and alcohol assessment, participating in random drug testing, participating in parenting education classes, and obtaining a mental health assessment. Father's plan consisted of attending team meetings, parenting education classes, finding stable housing, undergoing a drug and alcohol assessment and submitting to random drug testing.

Mother and father were advised that noncompliance or lack of progress in the plan could result in the termination of services and an appropriate permanent plan for D.P. Visits were ordered to be no less than twice a month. A six-month review hearing was scheduled for February 20, 2020.

***Six-Month Review***

The report prepared for the six-month review recommended that family reunification services be continued for mother and father. Mother and father were both in compliance with all service components of their plans. Mother and father both consistently visited D.P. as ordered. During visits, mother and father engaged with D.P. and showed her affection, which she reciprocated.

At the February 20, 2020 hearing, both mother and father submitted on the agency's recommendation and the court ordered continued family reunification services. The case plan remained in effect, with the addition of a mental health assessment for father as well. A 12-month review hearing was set for August 6, 2020.

***12-Month Review***

The report prepared in anticipation of the 12-month review recommended that reunification services be terminated for both mother and father.

4.

Mother initially attended and participated in the first team meeting in January of 2020 but failed to attend the second team meeting in May of 2020. The team meeting facilitator was not able to contact mother. While mother completed an intake appointment for behavioral health and recovery services, she did not follow through with services. Mother completed a parenting education class, but was only in partial compliance with psychotherapy services, attending services in January and June of 2020, but missing appointments in February, March, April and May of 2020. Mother was initially compliant with random drug testing but, during the 12-month review period, was sporadic and tested positive for amphetamine and methamphetamine in June of 2020 and had numerous "no shows." Mother was unable to maintain a stable and suitable residence and, as of June 2020, reported that she was homeless and working with a housing program.

Father's lack of compliance with his reunification services was similar to that of mother's. He attended the first team meeting but failed to attend the second. Attempts to contact father were unsuccessful. Father completed four of 18 behavioral health sessions, but his case was closed due to noncompliance in May of 2020. In June of 2020, father completed another intake assessment and participated in two sessions in that same month. But father failed to participate in continued services and his case was closed at the end of July 2020 for noncompliance. Father completed part of his parenting class, attending three of nine sessions. The group sessions were put on hold in March of 2020 due to Covid-19 and scheduled to resume at the beginning of July 2020, but father did not attend. Father was sporadic in his drug testing and tested positive for methamphetamine in both January and June of 2020 and had numerous "no shows." Father was also not able to maintain a stable and suitable residence and, as of the middle of June 2020, reported that he and mother were homeless although working with a housing program.

5.

Mother and father were both provided weekly two-hour supervised visits with D.P. During visits father and mother engaged in verbal arguments, failing to observe appropriate boundaries with one another in front of D.P.

An addendum report was filed by the agency on October 26, 2020, containing information of a domestic incident between mother and father. The sheriff's department was called to a local hospital where father was seen chasing mother through the parking lot. Mother was pregnant at the time.[2]

The addendum report also chronicled the times mother and father failed to drug test. Both failed to submit urine testing on July 24, 2020; August 21, 2020; September 8, 11, and 18, 2020; and October 1, 2020. And both failed to submit to hair follicle drug screening on September 8, 11, and 18, 2020; and October 1, 2020.

The 12-month review hearing was eventually heard on November 4, 2020. Mother and father submitted on the report. After considering the original 12-month report and the addendum report, the juvenile court adopted the recommendations of the agency and terminated mother and father's reunification services. A section 366.26 hearing was set for February 24, 2021.

### Section 366.26 Hearing

The original report prepared for the section 366.26 hearing recommended a permanent plan of legal guardianship for D.P. with her current relative caregivers and to dismiss dependency. At the scheduled hearing on February 24, 2021, counsel for the agency informed the juvenile court that it would file an addendum reflecting a change in the agency's recommendation to terminate parental rights and instead implement a plan of adoption. The relative caregivers had expressed their desire to adopt D.P.

The matter was continued, and the juvenile court set a contested section 366.26 hearing for April 27, 2021. The amended report was filed March 8, 2021.

---

[2] Neither this child nor an older child are at issue in this appeal.

The contested section 366.26 hearing was eventually heard on May 25, 2021. Mother and father appeared by video.

Counsel for father called the social worker as a witness. During direct examination, the social worker acknowledged that D.P. had stated she wished to live with her parents and her baby sister. The social worker knew of no issues or concerns with mother and father's visits with D.P. When asked if she knew how father and mother were doing with their services, the social worker replied that the parents tested positive for methamphetamine.

Mother's counsel asked the social worker why it was not in D.P.'s best interest to live with her parents because she enjoyed the visits. The social worker replied that mother and father were still "using" and the caregivers had reported that mother and father were saying things to D.P. to entice her to want to come home, such as showing her a "kitten we got you."

Father testified on his own behalf and admitted that he tested positive for a recent drug test and he had relapsed twice, but each time "only" for a day. On cross-examination, father testified that he was not aware that there was an issue with his urine sample, as he just gave the sample and went home.

Mother testified on her own behalf that she missed "maybe" two of her visits with D.P. When asked what mother had to offer D.P. that the relative caregivers could not provide, mother stated that D.P. could go outside and play and also be able to be with her baby sister. Mother acknowledged two positive drug tests.

The social worker was recalled and testified that D.P. was able, in her current placement, to play outside and that her baby sister was placed with the same caregiver. The social worker also testified that there was no indication that D.P. had any issues or difficulties separating from mother at the end of each visit.

Following argument from mother and father's counsel, as well as counsel for the agency, the juvenile court terminated mother and father's parental rights and ordered a permanent plan of adoption for D.P.

## DISCUSSION

Mother and father contend the court erred in finding that the beneficial parent-child relationship exception to termination of their parental rights did not apply. (§ 366.26, subd. (c)(1)(B)(i).)  For reasons explained below, we agree.

Once reunification services in a dependency case have been terminated, " 'the focus [of the proceedings] shifts to the needs of the child for permanency and stability.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52.)  Adoption then becomes the preferred permanent plan for the child, and it should be ordered "unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51, disapproved on other grounds in *Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5.)  Under section 366.26, once reunification services have been terminated, the juvenile court must terminate parental rights if it finds by clear and convincing evidence that the child is likely to be adopted.  (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249–250.)

"Even when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute.  One of these is the parental-benefit exception.  What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 629; see also § 366.26, subd. (c)(1)(B)(i).)

We apply the substantial evidence standard in reviewing the juvenile court's findings on the first two elements, whether the parent has consistently visited and maintained contact with the child, and whether the relationship is such that the child would benefit from continuing it. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–340.)  We

8.

review the juvenile court's findings as to the third element, whether there is detriment to the child in severing the relationship, for abuse of discretion. (*Id.* at pp. 640, 641 ["where, as with the parental-benefit exception, 'the appellate court will be evaluating the factual basis for an exercise of discretion, there likely will be no practical difference in application of the two standards' " of review], italics omitted.)

The first element, regular visitation and contact, is "straightforward" and "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Here, the juvenile court specifically found that mother and father met the first requirement of the beneficial parent-child relationship exception in that they maintained regular visitation with D.P., stating, "That is true. That has happened here. That's undisputed." (See *Caden C.*, *supra*, 11 Cal.5th at pp. 639–940 ["The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination."].) Respondent does not contest this finding.

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus is on the child and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*) Focusing on the child, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*) Recognizing that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern," the Supreme Court stated, "it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' " (*Ibid.*)

Here, D.P. was just days away from her fifth birthday when she was detained in August 2019. Although she and her parents were living in a condemned warehouse, she was found to be clean, well-groomed, and healthy (aside from a referral to an optometrist and the use of an inhaler) and did not present any mental or emotional concerns. D.P.'s interactions with mother and father were always described as positive, and D.P. consistently wished to return home. We will assume, without deciding, that the juvenile court found substantial evidence of the second element of the beneficial parent-child relationship exception here.

It is the juvenile court's handling of the third element of the beneficial parent-child relationship exception that is troubling here. "Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "[C]ourts need to determine … how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) Thus, " '[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Ibid.*)

The Supreme Court in *Caden C.* also discussed *improper* considerations in deciding whether termination of parental rights would be detrimental to a child. It is improper to compare a "parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)" when weighing whether termination would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) The hearing "is decidedly not a contest of who would be the better custodial caregiver," as nothing at the section 366.26 hearing allows the child to return to live with the parent. (*Ibid.*)

10.

In addition, a parent's "continued struggles" with the issues that led to dependency cannot, standing alone, be a bar to the parental-benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) "The exception preserves the child's right to the relationship even when the child cannot safely live with that parent. What it does not allow is a judgment about the parent's problems to deprive a child of the chance to continue a substantial, positive relationship with the parent." (*Id.* at p. 643.) However, a parent's struggles with the issues that led to the dependency are "relevant to the application of the [parental-benefit] exception" because it may be probative of whether interaction between parent and child has a negative effect on the child. (*Id.* at p. 637.)

Prior to *Caden C.*, intermediate appellate courts often required a parent to demonstrate that the parent "occupies a 'parental role' in the child's life" as part of proving the beneficial relationship element. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) "*Caden C.* did not address whether, to satisfy the [beneficial relationship] element, the nature of a parent's relationship must be 'parental' .… *Caden C.* said only that the child must have a 'substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship' [citations] .... Moreover, *Caden C.* also made clear that the type of relationship necessary to establish the exception is not narrowly defined or specifically identifiable, because parent-child relationships are endlessly varied." (*In re J.D.* (2021) 69 Cal.App.5th 594, 624.)

In denying the beneficial parent-child relationship exception, the juvenile court stated the following:

> "So the law is clear that the parents must show that they can, will and continue to fill a parental role in their child's life, which the parents have said they are willing to do more than just being a play friend. They've indicated that. And [counsel for the agency] did say that there are difficulties here. And I agree. There are difficulties.

"What tips the Court's decision in this case is the case cited in In re Breanna S. That's a 5th District Court of Appeal case, 2017, 8 Cal.App.5th [636] at Page 648 in which the Court cites an earlier decision in In re Noah G. within its decision, which states, in effect, in considering the parent-child relationship exception to termination of parental rights, quote, '[t]he juvenile court could properly focus on the mother's unresolved substance addiction issues because the children became dependents of the court due to her drug use,' close quote. That seems to be on point.

"The child here, [D.P.], was born positive for illegal substances, harmful toxic substances. And the child has been out of the parents' custody for 22 months. And the parents continue up to this day to test positive for meth. And they have admitted recent use of meth, relapse in this year. Knowing what's at stake, the parents' addiction is still substantial, the grips of the addiction are still substantial. And for that reason the Court is focusing on the unresolved substance addiction issues, finding that the parent-child relationship exception for termination has not been established and does not apply."

Both *In re Breanna S.* (2017) 8 Cal.App.5th 636 and *In re Noah G.* (2016) 247 Cal.App.4th 1292, settled law at the time of the section 366.26 hearing at issue, were disapproved in *Caden C.*, *supra*, 11 Cal.5th at page 637 and footnote 6, for the very reasons relied on by the juvenile court here. In *Caden C.*, the court explained that a "parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Caden C.*, *supra*, at p. 638.) The court held that "[p]arents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Id.* at p. 637.)

The juvenile court made its decision before *Caden C.* was decided. Given that the trial court's explanation clearly relied on mother and father's continued struggles with substance abuse as its basis for finding the beneficial parent-child relationship exception was not applicable, and in view of the importance of the parental relationship, we deem it prudent to remand for reconsideration so that the trial court can conduct its analysis

12.

consistent with the guidance provided in *Caden C.*  We express no opinion as to how the court should rule on remand.

## **DISPOSITION**

The order terminating parental rights is reversed and the matter remanded for the juvenile court to conduct a new section 366.26 hearing in conformance with the principles articulated in *Caden C.*, *supra*, 11 Cal.5th 614.

LEVY, Acting P. J.

WE CONCUR:


POOCHIGIAN, J.


MEEHAN, J.

13.