Filed 2/16/22  In re E.M. CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.M. et al., Persons Coming Under the Juvenile Court Law. | H049020 (Santa Clara County Super. Ct. Nos. 19JD025626, 19JD025627) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. M.M., Defendant and Appellant. | |

M.M. (mother) appeals from the juvenile court's order denying her Welfare and Institutions Code section 388[1] petition and the order after the section 366.26 hearing terminating her parental rights to her twin daughters, G.M. and E.M.  On appeal, mother argues that the juvenile court erred when it denied her section 388 petition because she established changed circumstances and reunification was in the twins' best interests.  She also argues that the trial court erroneously determined that she failed to establish the parental-benefit exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) when it terminated her parental rights, and the juvenile court may have considered factors deemed

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

inappropriate by *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). We conclude that the juvenile court did not abuse its discretion by denying mother's section 388 petition because she failed to meet her burden to demonstrate that returning the twins to her care would be in their best interests. We further conclude that mother has not affirmatively demonstrated that the juvenile court erred when it found the parental-benefit exception to be inapplicable. We affirm the juvenile court's order denying mother's section 388 petition and the order terminating mother's parental rights after the section 366.26 hearing.

## I. BACKGROUND

### A. *The Initial Dependency Proceedings*[2]

In February 2019, mother, who was intoxicated, ran a red light with her van while her twin daughters, G.M. and E.M. (both born in 2014), were unsecured in the backseat of the vehicle. At the time, mother was on active parole for a different alcohol-related child endangerment offense. Mother and the twins had been living in the van, and the children were placed in protective custody.

Mother was in a relationship with her boyfriend, who had perpetrated multiple acts of domestic violence against her in the past and was a registered sex offender. Mother and her boyfriend had an infant daughter together (G.M. and E.M.'s half-sibling). A social worker interviewed the twins and found that neither of the girls, who were four years old at the time, were potty trained.

The Santa Clara County Department of Family and Children's Services (Department) filed petitions under section 300, subdivisions (b)(1) (failure to protect), (c) (serious emotional damage), (g) (no provision for support), and (j) (abuse of a sibling)

---

[2] G.M.'s and E.M.'s father was not involved in the twins' lives and largely did not participate in the dependency proceedings.

alleging that the twins came within the juvenile court's jurisdiction. Following an initial hearing, mother was ordered to have supervised visits with the twins.

In May 2019, the juvenile court sustained the allegations in the petitions, and ordered family reunification services to mother. Mother, who had bipolar disorder and was struggling with depression and anxiety, was ordered to complete services including a parenting class, random drug and alcohol testing, a substance abuse program, and a program of counseling and psychotherapy.

During the dependency, the twins were placed with their caregiver, L.P. L.P. had provided daycare services to the twins for a year and a half before they entered the dependency system, and the twins had a strong connection with her and called her "grandma." L.P. expressed a willingness to adopt the twins if they were unable to reunify with mother. L.P. supervised visits between mother and the twins, which generally went well.

Mother, however, struggled with completing her case plan and had difficulty maintaining stable housing. In October 2019, the Department reported that mother had been asked to leave her transitional housing unit due to " 'unacceptable behavior.' " Between October and November 2019, mother was incarcerated for an assault.

In January 2020, mother was arrested for driving under the influence of alcohol while she was with her boyfriend. Prior to her arrest, mother had been living out of her van and in homeless shelters, and she had denied still being in a relationship with her boyfriend. Mother consistently visited the twins before her January arrest, but she had not visited since her incarceration as she did not want the twins to come to jail for visits.

In April 2020, the Department filed a status review report recommending that the juvenile court terminate family reunification services and set a section 366.26 hearing to select a permanent plan of adoption for the twins. According to the report, mother

3

expressed interest in reunifying with the twins, but she had been inconsistent with reaching her case plan goals.

Mother was released from custody in April 2020 and accepted into a sober living environment the following month. She regularly visited with the twins, initially over videoconference due to the statewide shelter-in-place order in response to the COVID-19 pandemic. In June 2020, the visits returned to an in-person format. Mother, however, moved out of her sober living environment in June 2020 after a conflict with another resident and was thereafter homeless and receiving hotel vouchers. Mother denied that she was in a relationship with her boyfriend, but there was evidence that she was not being truthful. In July 2020, the social worker saw mother's boyfriend waiting near an area where the social worker and mother had been planning to meet.

The Department reported that mother's visits with the twins were going well, and the visits were changed from supervised to monitored in August 2020. That same month, the visits were reverted to supervised visits after mother reportedly called her boyfriend during a visit with the twins.

By August 2020, mother had completed a parent orientation class, was participating in online parenting and parenting without violence classes. She was also seeing a therapist and had seen a psychiatrist. Mother, however, had been discharged from an outpatient drug treatment program due to her failure to maintain contact with the clinician.

In September 2020, the juvenile court terminated family reunification services to mother and set the matter for a selection and implementation hearing under section 366.26.

B. *The Section 366.26 Hearing Reports and Mother's Section 388 Petition*

In December 2020, the Department filed a section 366.26 hearing report summarizing mother's progress with her case plan and her visits with the twins.

4

According to the report, mother continued to have supervised visits with the twins until October 2020, when she switched to calling several times a week. Mother did not have transportation to visit the twins, and she wanted to avoid exposing L.P., who was immunocompromised, to COVID-19. Mother and L.P. intended to resume in-person visits when it was safe to do so.

The social worker reported that L.P. had a close bond with the twins, and both children expressed that they wanted to live with L.P. and referred to her as "grandma." The report contained little analysis of mother's bond with the twins, noting only that the social worker found that the twins "love their mother" and "enjoy their time together during their visits."

Also in December 2020, mother filed a section 388 petition requesting that the juvenile court return the twins to her care and order family maintenance services. According to mother's petition, she had completed the majority of her case plan services, including a parent orientation and parenting without violence class. She had maintained her sobriety for the past 11 months, regularly attended Alcoholics Anonymous meetings, received outpatient substance abuse treatment, and was now seeing a therapist and a psychiatrist. Mother had obtained a five-year restraining order against her boyfriend and had changed her phone number so that he could not contact her. She had also been recently approved for permanent subsidized housing.

In February 2021, the Department filed an addendum report providing updates about the family. Mother had recently moved into a one-bedroom apartment. She visited the children once a week either in-person or through FaceTime. According to the report, a mandated reporter had contacted the Child Abuse and Neglect Center in January 2021 to report that E.M. and G.M. had disclosed that they had been sexually abused by mother's boyfriend. When mother was informed about the allegations, she told the social worker that her daughters " 'wouldn't talk like that.' " Mother insisted that her boyfriend

5

had never been alone with the twins, and that she had not seen her boyfriend since July 2020.

Shortly after the allegations of sexual abuse came to light, E.M. told the social worker said that she wanted to live with mother. E.M., however, later said that she wanted to live with L.P. instead because it was " 'safer.' " E.M. said that she wanted to visit mother but live with L.P. At that time, neither of the twins disclosed any sexual abuse to the social worker.

In February 2021, E.M. told her therapist that mother's boyfriend had placed his hand inside her vagina and made her bleed. Later, E.M. told the social worker that she had told mother about what had happened, but mother did not care. It is unclear when E.M. spoke to mother about the abuse. Nothing in the record reflects that G.M. made any specific allegations of abuse.

In March 2021, the Department filed another addendum report. Mother had provided conflicting statements about E.M.'s allegations of abuse. First, mother denied that her boyfriend would sexually abuse the twins. Later, she told the social worker that if her boyfriend had sexually abused the twins, he would " 'go down for it.' "

Mother continued to visit the children once a week either in person or through FaceTime. After a visit in March 2021, L.P.'s daughter e-mailed the social worker and told her that G.M. had wanted to end the visit early and E.M. did not want to speak with mother. E.M. told her caregivers that mother was mad at her because she had disclosed the abuse committed by mother's boyfriend and that mother had told her " 'not to tell anyone.' " According to L.P.'s daughter, visits with mother caused E.M. anxiety.

C. *The Combined Sections 388 and 366.26 Hearing*

In March 2021, the juvenile court held a combined evidentiary hearing on mother's section 388 petition and the termination of mother's parental rights and the selection of the permanent plan under section 366.26. Several witnesses testified at the

6

hearing, including mother's sponsor, mother, and the two social workers who had been assigned to the twins' cases.

### 1. *Mother's Sponsor's Testimony*

Mother's sponsor had been working with mother for the past six months. The sponsor believed that mother was doing a "really great job" and was making progress on her substance abuse issues.

### 2. *Mother's Testimony*

Mother testified that she had completed numerous services, including parenting classes, substance abuse treatment, and domestic violence services. She had been sober for the past 14 months. Although she had been diagnosed with depression and psychosis, mother had both a therapist and a psychiatrist and was currently taking medication. Mother was not currently experiencing any mental health symptoms.

Mother was presently receiving a housing subsidy and was living in a one-bedroom apartment. Before she had secured housing, mother had been homeless for six years, which contributed to her alcoholism and made it challenging for her to receive assistance. If the twins were returned to her care, mother was hopeful that she would receive disability assistance, and she was looking for opportunities to work remotely from home. Mother believed that she had the resources to help her daughters with remote schooling.

Mother now recognized that her relationship with her boyfriend involved a pattern of domestic violence. She had not seen her boyfriend since July 2020, and she had obtained a restraining order against him. Although mother shared a daughter with her boyfriend, the daughter lived with her boyfriend's mother in Sacramento. Mother, however, admitted that she spoke to her boyfriend over the phone in August 2020 during a visit with the twins.

When mother visited the twins, she would color, sing ABCs, and play with them. Sometimes, the twins would get upset when the visits ended. Mother did not see the twins when she was incarcerated between February and March 2020, but she resumed visits in April 2020 after she was released. In October 2020, mother stopped in-person visits because she was homeless, did not have transportation, and did not want to put L.P. at risk of contracting COVID-19.

Mother acknowledged that E.M. had recently disclosed that she had been sexually abused by mother's boyfriend. Mother, however, did not think that the abuse had impacted her relationship with E.M.

Mother characterized herself as the twins' primary caretaker before the dependency proceedings were initiated. She believed that the twins wanted to live with her and that living with her would be in their best interests.

3. ***Social Worker Christina Nelson's Testimony***

Social worker Nelson had been previously assigned to the twins' dependency case. Nelson was concerned about mother's contacts with her boyfriend, but she believed that the restraining order that mother had obtained against him was a step in the right direction.

Aside from a supervised visit in September 2020, Nelson had not personally observed mother and the twins interact for over a year and a half. Nelson largely evaluated the strength and quality of mother's relationship with the twins by talking to mother, L.P., and the twins. Nelson acknowledged mother had a bond with the twins, and L.P. consistently reported that mother's visits generally went well.

According to Nelson, the twins seemed to love L.P. and felt safe in L.P.'s home. Nelson believed that L.P. occupied a "parental role" to the twins because she provided them with food, clothing, shelter, and transportation, she took the twins to their medical and dental appointments, and she provided emotional support. L.P. also provided the

8

twins with structure and routine, which was important to their psychosocial and emotional development. Nelson believed it would be "traumatic" to remove the twins from L.P.'s care.

In contrast, Nelson opined that mother had failed to protect her daughters, especially in light of E.M.'s recent disclosure of sexual abuse. Nelson did not believe that mother had taken responsibility for her actions, and she was concerned that mother was not being honest about her contacts with her boyfriend. Nelson did not think that mother had a viable plan to take care of the children should they be returned to her care, and she did not believe the twins' relationship with mother outweighed the stability and security they would receive from being adopted by L.P.

### 4. *Social Worker Elvira Estevez's Testimony*

Social worker Estevez had been recently assigned to take over E.M. and G.M.'s case. According to Estevez, E.M.'s recent allegations of sexual abuse had been found to be inconclusive.

### 5. *L.P.'s Testimony*

The twins had been living with L.P. for the past two years, and L.P. loved them and considered them part of her family. The twins called L.P. "gramma" and called mother "mom." L.P. supervised mother's visits with the children, which she believed went well, but mother never stayed for a full two-hour visit. Mother brought presents for the twins when she visited, including toys and food. Mother and the twins were physically affectionate during the visits, but the twins never got upset when visits ended. L.P. did not think that mother was a significant person in the twins' lives because they rarely asked about her and were happy living with L.P. According to L.P., everything had been "good" until mother secured housing and E.M. disclosed that mother's boyfriend had sexually abused her. Afterwards, E.M. no longer wanted to talk to mother.

9

D. *The Juvenile Court's Orders*

On April 15, 2021, the juvenile court denied mother's section 388 petition. The juvenile court concluded that mother's circumstances were "changing," not changed, although there was evidence that mother was "working hard." Nonetheless, the juvenile court observed that regardless of whether mother's circumstances were changing or changed, mother had not met her burden to demonstrate that it would be in the twins' best interests to be returned to her care. The juvenile court noted that when E.M. recently disclosed the allegations of sexual abuse, mother's initial reaction was to defend her boyfriend and disbelieve E.M., which was not "protective of her daughters." Moreover, E.M. said that she does not want to talk to mother, and G.M. was not fully taking advantage of mother's visits. In contrast, the twins were bonded with L.P., who had cared for them for the past two years.

After reaching its decision on mother's section 388 petition, the juvenile court turned to its decision on the section 366.26 hearing, and made the following findings: "As for the .26 hearing, unfortunately, for Mother this is an even higher hurdle for her and a standard that she cannot meet to show the beneficial bond. She cannot show and did not show that she's in a parental role at this point vis-à-vis the girls. Although they were in her care for the first several years of her life, even then they spent a very large portion of their time in [L.P.'s] care. This case is not nearly as strong as [*In re Noah G.* (2016) 247 Cal.App.4th 1292, disapproved of by *Caden C.*, *supra*, 11 Cal.5th 614], where, in that case, the mother was visiting daily, did more of the day-to-day care, and even then, it was still deemed insufficient to meet the beneficial bond. Here, the visits were returned to supervised in September. [E.M.] indicated a desire not to visit with her Mom. [G.M.] has, as I said, cut some of her visits short. Given all of this, Mother cannot show that there would be detriment to terminating—that the detriment to terminating the relationship with her outweighs the benefits of adoption."

10

The juvenile court, however, also acknowledged that "there is detriment" to terminating the parental relationship but concluded that mother could not show that "the detriment to terminating the relationship with her outweighs the benefits of adoption." Thereafter, the juvenile court found that there was clear and convincing evidence that the twins were likely to be adopted and terminated mother's parental rights. Mother subsequently filed a timely notice of appeal from the juvenile court's orders denying her section 388 petition and terminating her parental rights under section 366.26.

## II. DISCUSSION

### A. *The Section 388 Petition*

Mother argues that the juvenile court abused its discretion by denying her section 388 petition because she demonstrated changed circumstances and that returning the twins to her care would be in their best interests. The Department argues that the trial court did not abuse its discretion when it found that mother did not meet her burden under section 388. As we explain, we conclude that the juvenile court did not abuse its discretion.

#### 1. *General Legal Principles and Standard of Review*

Under section 388, subdivision (a)(1), a parent may, "upon grounds of change of circumstance or new evidence," petition the juvenile court "for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." The juvenile court must order a hearing on the section 388 petition "[i]f it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . ." (§ 388, subd. (d).)

"The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child." (*In re Mickel O*. (2011) 197 Cal.App.4th 586, 615.)

11

After the termination of reunification services, the focus of the dependency proceedings " ' "shifts to the needs of the child for permanency and stability." ' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 526 (*J.C.*).)  "[T]he parents' interest in the care, custody and companionship of the child are no longer paramount." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)  Thus, a juvenile court hearing a section 388 petition during the post-reunification stage " 'must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child.' " (*Stephanie M.*, *supra*, at p. 317.)

We review the denial of a section 388 petition for an abuse of discretion. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.)  A juvenile court abuses its discretion if its decision exceeds the bounds of reason. (*J.C.*, *supra*, 226 Cal.App.4th at p. 525.)

2. *Analysis*

Even if we assume that mother met her burden to demonstrate changed circumstances, we find that the juvenile court did not abuse its discretion when it concluded that mother failed to demonstrate that returning the twins to her care under a plan of family maintenance was in their best interests.

Mother filed her section 388 petition after the juvenile court had already terminated reunification services.  Accordingly, when the juvenile court considered mother's section 388 petition, the focus was no longer on mother's interest in the care, companionship, and custody of the twins—instead, the focus shifted to the needs of the twins for permanency and stability. (*J.C.*, *supra*, 226 Cal.App.4th at p. 526; *Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

By the time of the hearing on the section 388 petition, the twins had been in L.P.'s care for almost two years, starting in May 2019.  The twins had a close bond with L.P., who had previously provided them with childcare, and they expressed that they wanted to live with L.P. and referred to her as "grandma."  L.P. considered the twins to be a part of

her family.  Social worker Nelson assessed that the twins felt safe in L.P.'s home, and L.P. provided the twins with food, clothing, and shelter.  Moreover, Nelson opined that L.P. provided the twins with emotional support and gave them structure and routine.  Nelson also believed that removing the twins from L.P.'s care would be traumatic because of the strong support system provided by L.P.

We recognize that there is evidence that the twins were bonded with mother and that mother had maintained her sobriety and made progress on achieving her case plan goals.  Nonetheless, there was ample evidence that returning the twins to mother's care under a plan of family maintenance would disrupt the security and stability of their current placement with L.P., which would not be in their best interests.  Moreover, there was evidence that the twins felt uneasy during visits with mother.  For example, E.M. said that she thought that mother was upset with her after she disclosed the sexual abuse committed by mother's boyfriend.  E.M. did not want to speak with mother and visits with mother caused her anxiety.  And at one point, E.M. said that she wanted to live with L.P. because it was " 'safer.' "  Additionally, G.M. wanted to end a visit with mother early.

In sum, the trial court did not abuse its discretion when it determined that mother did not meet her burden to demonstrate by a preponderance of the evidence that it would be in the twins' best interests to return to her care under a plan of family maintenance. (*J.C.*, *supra*, 226 Cal.App.4th at p. 525.)

B. ***The Parental-benefit Exception***

Next, mother argues that the juvenile court abused its discretion when it terminated her parental rights because she met her burden to demonstrate the existence of the parental-benefit exception to adoption.  The Department argues that even if we assume that mother met her burden on the first two elements of the parental-benefit exception, (1) regular visitation and contact and (2) the existence of a beneficial

13

relationship, the juvenile court did not abuse its discretion on the third step of its analysis, concluding that terminating parental rights would not be detrimental to the twins. As we explain, we conclude that even if we assume that the juvenile court found that mother met her burden on the first two elements of the parental-benefit exception, the juvenile court did not abuse its discretion on the third step of its analysis when it found that terminating parental rights would not be detrimental to the twins. Accordingly, we conclude that the juvenile court did not err when it terminated mother's parental rights.

1. ***General Legal Principles and Standard of Review***

The juvenile court must set a section 366.26 hearing when it cannot return a child to their parents' custody within the statutory time limits. (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) At the section 366.26 hearing, the juvenile court selects and implements a permanent plan for the child. (*Caden C.*, *supra*, at p. 630.)

"To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) Under section 366.26, subdivision (c)(1), the juvenile court must first determine by clear and convincing evidence whether the child is likely to be adopted. If so, and if there is a previous order that terminated reunification services to the parents, then the juvenile court shall terminate parental rights to allow for adoption unless terminating parental rights would be detrimental to the child for one of the six specifically enumerated statutory exceptions. (See § 366.26, subd. (c)(1)(B)(i)-(vi).) If the parent shows that termination of parental rights would be detrimental to the child, the juvenile court should decline to terminate parental rights and select another permanent plan. (§ 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A).)

One of the statutory exceptions to adoption is the parental-benefit exception set forth under section 366.26, subdivision (c)(1)(B)(i). This exception applies when "[t]he

14

court finds a compelling reason for determining that termination would be detrimental to the child" (*id*., subd. (c)(1)(B)) because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" (*id*., subd. (c)(1)(B)(i)). There are three elements that a parent must prove to establish the parental-benefit exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C*., *supra*, 11 Cal.5th at p. 631; § 366.26, subd. (c)(1)(B)(i).)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C*., *supra*, 11 Cal.5th at p. 632.) "As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' " (*Ibid*.) The third element requires the juvenile court to "decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Id*. at p. 633.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Ibid*.)

We review the juvenile court's determination as to the first two elements—regular visitation and contact and the existence of a beneficial relationship—for substantial evidence. (*Caden C*., *supra*, 11 Cal.5th at pp. 639-640.) We review the juvenile court's determination as to the third element, whether termination of parental rights would be detrimental to a child, for an abuse of discretion. (*Id*. at p. 640.)

2. *The Juvenile Court's Findings at the Section 366.26 Hearing*

At the section 366.26 hearing, the juvenile court did not make an express finding on the first element of the parental-benefit exception, whether mother made regular visitation and contact. (§ 366.26, subd. (c)(1)(B)(i).) The juvenile court also did not

15

make an express finding on the second element, the existence of a beneficial relationship. (*Ibid.*) As to the second element, the juvenile court acknowledged that "there is detriment" to terminating the parental relationship. But since "[i]nteraction between natural parent and child will always confer some incidental benefit to the child" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*)), it follows that terminating a parental relationship may necessarily cause some detriment to a child even if the relationship does not rise to the level of significant, positive emotional attachment. The juvenile court, however, expressly reached the third step of the parental-benefit analysis and found that mother had not shown "that the detriment to terminating the relationship with her outweighs the benefits of adoption." (§ 366.26, subd. (c)(1)(B).)

A parent is required to prove all three elements for the parental-benefit exception to apply. (*Caden C.*, *supra*, 11 Cal.5th at p. 631; § 366.26, subd. (c)(1)(B)(i).) Because the juvenile court expressly reached the third element, we assume for the purposes of this appeal that mother met her burden on the first and second elements and proceed to address whether it abused its discretion on the third element. And, as explained below, we must affirm the juvenile court's order terminating parental rights because we find that the juvenile court did not abuse its discretion on the third element.

### 3. *Detriment from Severing the Parental Relationship*

The third element requires the juvenile court to "decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) After carefully reviewing the record, we find that the juvenile court did not abuse its discretion when it determined that terminating mother's parental rights would not be detrimental to the twins. (§ 366.26, subd. (c)(1)(B); *Caden C.*, *supra*, at p. 640.)

At the section 366.26 hearing, the juvenile court recognized that the twins would suffer at least some harm if mother's rights were terminated, stating that there "is

16

detriment" from losing the parental relationship. The twins were four years old when they were removed from mother's custody, and they had spent the majority of their lives under mother's care. Before E.M. disclosed the alleged abuse committed by mother's boyfriend, the Department's reports and L.P.'s testimony at the hearing reflected that mother's visits with the twins went well. The record demonstrates that the twins clearly have a bond with mother.

The juvenile court, however, expressly stated that it found that the harm stemming from terminating the relationship did not outweigh the benefits of adoption for both girls. As recognized in *Caden C.*, a parental relationship can sometimes involve "tangled benefits and burdens." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) In this case, the juvenile court noted that E.M. had expressed a desire not to visit with mother, and G.M. had asked to end some of her visits early. As reflected in the Department's reports and L.P.'s testimony at the hearing, E.M. had demonstrated anxiety around mother after she disclosed that mother's boyfriend had sexually abused her. E.M. had told her caregivers that mother was mad at her because she had disclosed the abuse, and mother had told her " 'not to tell anyone.' " Mother had also initially denied that boyfriend would sexually abuse her children.

In contrast, there was evidence in the record that the twins were doing well in L.P.'s care. The twins had lived with L.P. for almost two years and had bonded with L.P. and L.P.'s extended family. They had a close connection with L.P., who had also provided them with childcare for two years before the initiation of dependency proceedings. While the twins were in her care, L.P. provided them with safety, security, and a routine. In fact, in January 2021, E.M. told the social worker that she wanted to live with L.P. instead of mother because it was " 'safer.' "

When determining whether the parental-benefit exception applies, the juvenile court is required to weigh whether the harm from terminating mother's parental rights

17

would outweigh the " 'the security and the sense of belonging a new family would confer.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) This is a "fraught determination" (*id.* at p. 625) that requires a "delicate balancing" (*id.* at p. 640) of multiple factual determinations. Having considered all the evidence in the record, the juvenile court reasonably concluded that the harm that the twins would incur from losing their parental relationship with mother did not outweigh the benefits of adoption. (*Id.* at p. 634.)

We acknowledge that in this case, the juvenile court observed that mother was not in a "parental role at this point vis-à-vis the girls" and briefly referenced the provision of "day-to-day care." In her supplemental brief, mother argues that the juvenile court's statements reflect that it considered factors deemed inappropriate in *Caden C.* when analyzing the applicability of the parental-benefit exception.[3] Although we have assumed for the purposes of this appeal that the juvenile court found that mother met her burden on the first and second elements of the parental-benefit exception, we conclude that the juvenile court's statements do not reflect it considered inappropriate factors at any step of its analysis. This court's recent decision in *In re A.L.* (Jan. 18, 2022, H048761) __ Cal.App.5th __ [2022 Cal.App. LEXIS 33] (*A.L.*) is instructive. In *A.L.*, the father argued that following *Caden C.*, a parent is no longer required to show that he or she occupies a parental role for the parental-benefit exception to apply. (*Id.* at p. __ [at p. *42].) This court concluded that "the strength and quality of the parent's relationship with the child, including whether that parent has a parental role, is a relevant consideration to the court's detriment finding." (*Id.* at p. __ [at p. *42].) Accordingly, we held that the father did not

---

[3] After briefing in this case was completed, we requested that the parties file supplemental briefs on whether the juvenile court's reference to mother's failure to occupy a "parental role" to the twins indicated that it improperly considered factors deemed inappropriate by *Caden C.* in the second step of its analysis.

demonstrate error even though the juvenile court stated during the section 366.26 hearing that the father did not occupy a parental role. (*A.L.*, *supra*, at pp. __ [at pp. *42-51].)

As in *A.L.*, the juvenile court's statements in this case do not affirmatively reflect a consideration of inappropriate factors. Whether a parent has visited often or assumed caretaking duties is not unrelated to whether a parent and child have formed a beneficial relationship. As explained in *Autumn H.*, *supra*, 27 Cal.App.4th 567, "[t]he significant attachment from child to parent results from the adult's attention to the child's need for physical care, nourishment, comfort, affection and stimulation." (*Id*. at p. 575.) In other words, whether a parent has diligently tended to a child's day-to-day needs can support a conclusion that there is a strong, positive attachment between a parent and a child. It follows that whether a parent occupies a parental role to a child is relevant to determine whether the child would suffer detriment from terminating the parental relationship. (*A.L.*, *supra*, __ Cal.App.5th at p. __ [at p. *42].)

The juvenile court's statements must be also considered in context. When making its findings after the section 366.26 hearing, the juvenile court observed that mother's visits had recently reverted to supervised visits, but, immediately after, noted that E.M. had recently expressed a desire not to visit mother, and G.M. had cut some of her visits short. As a result, it does not appear that the juvenile court was considering mother's struggles with her case plan or that mother no longer had a custodial role; rather, it was considering how the twins felt about mother during their visits. As acknowledged in *Caden C.*, it is proper for the juvenile court to consider how the twins "feel about, interact with, look to, or talk about" mother when determining the applicability of the parental-benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Moreover, the juvenile court, when observing that the twins had spent a large portion of time in L.P.'s care, appears to have been weighing the benefits of the adoptive home with the detriment the twins would suffer from losing their parental relationships with mother. The juvenile

19

court is required to undertake this weighing duty in the third step of its analysis. (*Id*. at p. 634.)

As cautioned in *Caden C*., a parental relationship can be shaped by a "slew of factors" and it is not necessary, if it were even possible, to quantitatively measure " 'the specific amount of "comfort nourishment, or physical care" ' " that a parent provides during visits. (*Caden C*., *supra*, 11 Cal.5th at p. 632.) Furthermore, the juvenile court "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)" when it examines the applicability of the parental-benefit exception because "[n]othing that happens at the section 366.26 hearing allows the child to return to live with the parent." (*Id*. at p. 634.) Based on the record before us, the juvenile court's bare references to a "parental role" and the provision of "day-to-day care" does not support the inference that it erroneously believed that the parental-benefit exception could not apply because mother was unable to assume full custody of the twins or that it relied solely on a comparison between L.P.'s and mother's respective attributes as custodial caretakers.

We acknowledge that following *Caden C*., multiple Courts of Appeal have concluded that a juvenile court's determination that a parent does not occupy a "parental role" may reflect a consideration of factors deemed inappropriate by our high court. (See *In re B.D*. (2021) 66 Cal.App.5th 1218 (*B.D*.); *In re J.D*. (2021) 70 Cal.App.5th 833 (*J.D*.); *In re D.M*. (2021) 71 Cal.App.5th 261 (*D.M*.); *In re L.A.-O*. (2021) 73 Cal.App.5th 197 (*L.A.-O*.).) We find these cases distinguishable, and they do not persuade us that the juvenile court erred and applied an incorrect legal standard as articulated in *Caden C*.

First, in *B.D*., *supra*, 66 Cal.App.5th 1218, the juvenile court expressly considered whether the parents occupied a " 'parental role' " and whether a " 'parental relationship' " existed. (*Id*. at p. 1229.) The Fourth Appellate District concluded that the

20

juvenile court's references to whether the parents were in a parental role or in a parental relationship with their children were "concerning" because "it [was] unclear what weight the juvenile court placed on these conclusions when balancing the harm of severing the natural parent-child relationship to the benefits of a new adoptive home in the crucial third step of the analysis." (*Id*. at p. 1230.) The juvenile court had also considered a social worker's report equating a parental role with the ability to parent on a fulltime basis and maintain sobriety. (*Id*. at p. 1229.) Thus, *B.D*. found that the juvenile court considered improper factors at the second step of its analysis and reversed the juvenile court's order terminating parental rights. (*Id*. at p. 1230.)

*B.D.* is distinguishable. In *B.D*., the juvenile court expressly considered a social worker's report that equated a parental role with factors deemed inappropriate in *Caden C*.—the ability to assume all caretaking duties and to maintain sobriety. (*B.D.*, *supra*, 66 Cal.App.5th at p. 1229.) As *Caden C*. cautioned, "whether the parent is or is not 'ready for the children's return to [the parent's] custody' is not, by itself, relevant to the application of the parental-benefit exception" (*Caden C.*, *supra*, 11 Cal.5th at p. 638). There is no evidence that the juvenile court erroneously determined that the parental-benefit exception was inapplicable based on these considerations.

Likewise, in *J.D.*, *supra*, 70 Cal.App.5th 833, the First Appellate District observed that it could not be certain that the juvenile court "did not rely on improper factors" when it assessed the second element of the parental-benefit exception. (*Id*. at p. 863.) In part, the Court of Appeal noted that the juvenile court found that the mother's relationship with the child "did not 'amount to a parental bond.' " (*Id*. at p. 864.) *J.D.* observed that *Caden C*. did not address whether a parents' relationship with a child must be "parental" for the parental-benefit exception to apply, and the juvenile court's use of the descriptor, "parental," was "standing alone," "vague and unhelpful." (*Ibid*.) In *J.D.*, however, the agency's counsel and the minor's counsel both alluded to factors deemed irrelevant in

21

*Caden C.*, such as the fact that the minor viewed the caregiver's home as his home and the mother's visits were still supervised, which suggested that the mother's parenting struggles were a reason to rule against her. (*Id*. at pp. 863-864.) Thus, *J.D.* concluded that the juvenile court may have applied the wrong legal standard under *Caden C*. when evaluating the second element of the parental-benefit exception and reversal was required because it was unclear whether and to what extent the juvenile court had considered improper factors. (*Id*. at p. 865.)

As with *B.D.*, *J.D.* is distinguishable. Unlike in *J.D.*, there is nothing in the record before us to suggest that the attorneys in this case urged the juvenile court to rule against mother solely because of her struggles with her case plan.[4] (*J.D.*, *supra*, 70 Cal.App.5th at pp. 863-864.)

Most recently, in *L.A.-O.*, *supra*, 73 Cal.App.5th 197 the Fourth Appellate District noted that the term " 'parental role' " can have different meanings—it can mean that parents have been "nurturing, supportive, and guiding." (*Id*. at p. 210.) However, "parental role" can also be equated with providing care such as changing diapers, providing toys and food, and helping with homework. (*Ibid*.) *L.A.-O.* found that this latter definition would conflict with *Caden C*.'s admonition that parent-child relationships do not always conform to a consistent pattern. (*Ibid*., citing *Caden C*., *supra*, 11 Cal.5th at p. 632.) Because the juvenile court stated that the parents had not occupied a parental role in a " 'long time,' " *L.A.-O.* determined that the juvenile court appeared to have meant that the parents were not capable of taking custody, had not been

_____

[4] For example, during the section 366.26 hearing, the Department's counsel argued that there was no evidence that the "relationship [with mother] is so strong that it would outweigh the security and stability that the child would receive from adoption." Counsel for the twins argued that "mother ha[d] not presented evidence to show that her bond with the children is that strong [to outweigh the benefits of adoption], especially given the children's recent refusal to visit, or ending visits early in [G.M.'s] case."

good parents, or had not been providing necessary parental care. (*L.A.-O.*, *supra*, at p. 212.) Finding such considerations to be erroneous, the *L.A.-O.* court reversed the juvenile court's order terminating parental rights. (*Ibid.*)

We agree with *L.A.-O.* that, standing alone, the juvenile court's use of the term "parental role" can convey different meanings, some of which may encompass factors deemed irrelevant in *Caden C.* However, we do not believe that mother has met her burden on appeal to demonstrate that the juvenile court erred in the third step of its analysis. As we explained in *A.L.*, a juvenile court is not required to state its findings about the applicability of the parental-benefit exception on the record, nor is a juvenile court's reasoning at the hearing "intended to be a recitation of the exclusive basis for the court's decision." (*A.L.*, *supra*, __ Cal.App.5th at p. __ [at p. *50].) Moreover, as the appellate court, we must " ' "indulge in every presumption to uphold a judgment, and it is [appellant's] burden on appeal to affirmatively demonstrate error." ' " (*Id.* at p. __ [at p. *50].) With these principles in mind, the juvenile court's fleeting reference to mother's ability to occupy a "parental role" was likely a commentary on the strength and quality of mother's relationship with the twins.[5]

---

[5] We also find *D.M.*, *supra*, 71 Cal.App.5th 261 to be distinguishable. In *D.M.*, the juvenile court noted that the father had not " 'risen to the level of a parent' " because he had not attended dental or medical appointments and did not know his children's medical needs. (*Id.* at pp. 268, 270.) The Second Appellate District noted that the parental-benefit exception is "*not* focused on a parent's ability to care for a child or some narrow view of what a parent-child relationship should look like. [Citation.] Instead, the focus is whether there is a substantial, positive emotional attachment between the parent and child." (*Id.* at p. 270.) Thus, *D.M.* concluded that the juvenile court erroneously equated a parental role with attendance at medical appointments and understanding medical needs. (*Id.* at p. 268.) Here, the juvenile court remarked that mother did not occupy a parental role to the twins, but, unlike in *D.M.*, the juvenile court in this case did not expressly state that it equated a parental role with the provision of medical care.

23

In her supplemental brief, mother argues that the juvenile court merely "bootstrapped" the findings that it made on the section 388 petition to its findings after the section 366.26 hearing, citing to the juvenile court's comments that mother had an " 'even higher hurdle' " to meet to show the existence of the parental-benefit exception. However, the juvenile court made separate findings on the section 388 petition and the termination of parental rights. And its assertion that mother faced a " 'higher hurdle' " to demonstrate the existence of the parental-benefit exception does not necessarily reflect that it misunderstood the scope of its discretion or conflated its analysis of the two statutes. We cannot assume error occurred, and, on this record, mother has failed to affirmatively demonstrate its existence. (*A.L.*, *supra*, __ Cal.App.5th at p. __ [at p. *50].)

Undoubtedly, the termination of parental rights is a decision that has permanent and lasting impacts on both mother and the twins because it "eliminates any legal basis for the parent or child to maintain the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The record reflects that mother loves her children and believes that the detriment from severing her relationship with them outweighs the benefits of adoption. There is evidence in the record to support mother's claims, but we must review the juvenile court's determination on the third element of the parental-benefit exception for an abuse of discretion. (*Id*. at p. 640.) Here, mother has not demonstrated that the juvenile court made an " ' " 'arbitrary, capricious, or patently absurd determination,' " ' " and we may not substitute our judgment for that of the juvenile court. (*Id*. at p. 641.) Having found no abuse of discretion, we must affirm the juvenile court's order terminating parental rights.

### III. DISPOSITION

The order denying mother's Welfare and Institutions Code section 388 petition and the order after the Welfare and Institutions Code section 366.26 hearing terminating parental rights are affirmed.

24

_____
                      Wilson, J.


WE CONCUR:


_____
           Danner, Acting P.J.




_____
              Lie, J.




<u>In re E.M.</u>
H049020